UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **SONICSOLUTIONS ALGAE CONTROL, LLC,** | ) | Civil Action No. |
| **SONIC SOLUTIONS, LLC, and** | ) | |
| **ALGAECONTROL.US LLC,** | ) | |
| | ) | **VERIFIED** |
| **Plaintiffs,** | ) | **COMPLAINT FOR** |
| | ) | **INJUNCTIVE RELIEF** |
| v. | ) | **AND DAMAGES** |
| | ) | **(JURY TRIAL** |
| **DIVERSIFIED POWER INTERNATIONAL, LLC,** | ) | **DEMANDED)** |
| **and ANTONIO TRIGIANI,** | ) | |
| | ) | |
| **Defendants.** | | |

## I.  INTRODUCTION

1.      Plaintiffs SonicSolutions Algae Control, LLC, Sonic Solutions, LLC, and AlgaeControl.US LLC seek immediate injunctive relief, including a temporary restraining order, to prevent the demise of Plaintiffs' business and other irreparable harm arising from Defendants' intentional, tortious interference with Plaintiffs' contractual relationships, contract rights, and business relationships; breach of contract; unfair business practices; false advertising; and defamation. Plaintiffs also seek a permanent injunction and damages, including punitive damages, as further stated herein.

## II.  PARTIES

2.      Plaintiff SonicSolutions Algae Control, LLC ("SSAC") is a Delaware limited liability company with its principal place of business at 238 Bridge St, Unit B, Northampton, Massachusetts, 01060.

3.     Plaintiff Sonic Solutions, LLC ("Sonic Solutions") is a Massachusetts limited liability company with its principal place of business also at 238 Bridge St, Unit B, Northampton, Massachusetts, 01060.

4.     Plaintiff AlgaeControl.US LLC ("ACUS") is a South Carolina limited liability company with a business address of 1514 Mathis Ferry Rd, Suite 14, Mt. Pleasant, South Carolina 29464.

5.     On information and belief, Defendant Diversified Power International, LLC ("DPI") is a Tennessee limited liability company with a principal place of business at 414 Century Court, Piney Flats, Tennessee 37868.

6.     On information and belief, Defendant Antonio Trigiani is an individual residing in Tennessee and is the sole owner and president of DPI.

## III.     JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because no plaintiff shares a state of citizenship with any defendant and the amount in controversy exceeds $75,000.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because it is a judicial district in which a substantial part of the events or omissions giving rise to the claims at issue occurred.

## IV.   FACTS

**A.     Defendants Execute a Nondisclosure and Noncompete Agreement with Sonic Solutions, Expressly Committing Not To Use Sonic Solutions' Confidential Information to Compete with It.**

9.     Dana Taylor and his partners created Sonic Solutions, LLC on May 13, 2002 as a dealer of third party ultrasound products used to control algae growth in water bodies.

10. In or around 2004, Sonic Solutions began selling its own ultrasound products.

11. Sonic Solutions developed an extensive network of dealers that distributed its products.

12. In 2012, Defendant Trigiani and Mr. Taylor began discussing the possibility of DPI providing components for products offered by Sonic Solutions.

13. Each party expressly agreed, in an agreement effective May 8, 2012 (the "DPI Noncompete"), "to maintain and keep as confidential all information received from the other and not to use such information to compete directly or indirectly with the other ...." A copy of the DPI Noncompete is attached hereto as Exhibit 1.

14. Each party further agreed that the other party would be entitled to "an injunction, without any bond or other security being required therefor, restraining any breach" of the provisions of the DPI Noncompete if the party committed or threatened any such breach.

15. The DPI Noncompete remains in effect and enforceable.

16. At the time DPI entered into the DPI Noncompete, DPI did not manufacture or sell ultrasound devices.

**B. George Hutchinson Develops a Superior Ultrasound Algae Control Technology for DPI.**

Plaintiffs are informed and believe, and upon such information and belief, state that:

17. In or about 2014, Defendant Trigiani met with George Hutchinson, an engineer familiar with ultrasound technology.

18. Mr. Hutchinson subsequently designed ultrasound devices that would be manufactured and marketed as the "Mezzo" and the "Quattro" within DPI's new Hydro BioScience ("HBS") ultrasound product line.

19. The HBS products were superior to other ultrasound algae control products then available in the market.

20. Mr. Hutchinson's company, ACUS, began to supply its customers with DPI's HBS products in or around May 2016.

21. Sonic Solutions also began to distribute HBS products to its clients in or about March 2018.

### C. Sonic Solutions Creates a New Company that Builds Its Identity Upon the Marketing, Sale, and Service of HBS Products.

22. By January of 2018, Sonic Solutions had ceased manufacturing its own product and had transitioned to marketing and selling only DPI's HBS products.

23. Beginning in the fall of 2018, Defendant Trigiani, Mr. Taylor, and Mr. Hutchinson had a series of discussions about combining Sonic Solutions, ACUS, and DPI's HBS division into a new entity to market the new HBS products.

24. Defendant Trigiani subsequently declined, in February 2019, to join the partnership and instead encouraged Mr. Taylor and Mr. Hutchison to create their own entity to be the exclusive distributor of DPI's HBS product line.

25. On May 6, 2019, Sonic Solutions and ACUS created SonicSolutions Algae Control, LLC, ("SSAC") headquartered in Northampton, Massachusetts.

26. The parties created SSAC solely to distribute DPI's HBS products.

27. Sonic Solutions and ACUS transitioned their respective dealerships to SSAC dealerships selling HBS products.

28. DPI represented to prospective clients that SSAC was DPI's exclusive distributor of HBS products. *See, e.g.,* Ex. 3.

29. Defendants took actions to promote the "SonicSolutions Algae Control" brand as the commercial identity of HBS products.

30. Among other things, the user manual that DPI produced for the HBS Products under the direction of Defendant Trigiani was branded "**SonicSolutions ALGAE CONTROL**" on its cover (the "HBS User Manual"). Attached hereto as Exhibit 2 is a true and accurate copy of the HBS User Manual.

31. The HBS User Manual directed purchasers of the HBS products to process all warranty claims through SSAC. Ex. 2 at 39, 40.

32. The HBS User Manual directed purchasers of the HBS products to contact SSAC for "Customer Service" "Return Information," and "product updates, technical information, or general inquiries." Ex. 2 at 39, 40.

33. The SonicSolutions Algae Control branded HBS User Manual was included with shipments of HBS products.

34. In reliance on the understanding that SSAC was the primary distributor of HBS products, SSAC invested significant time and money in developing the commercial reputation of HBS technology and products and in developing SSAC's commercial identity as the unique source for those products and related services.

35. SSAC marketed and sold HBS products primarily on the basis of the extensive client base that it and its parent companies, Sonic Solutions and ACUS, had built over many years.

36. SSAC continued to develop an extensive network of dealers and customers, both current and prospective, on the basis of its marketing of HBS products.

37.     Many of the SSAC clients had contracts and longstanding business relationships with SSAC encompassing the purchase of ultrasonic products that committed the clients to purchasing HBS products solely from SSAC.

38.     In reliance upon the DPI Noncompete and DPI's agreement that SSAC would be the primary source of the HBS products, Sonic Solutions and SSAC shared their clients' identities and contact information, and related confidential business information, with DPI so that, for efficient and timely customer service, DPI could ship HBS products directly to SSAC clients.

39.     In further reliance on the DPI Noncompete and DPI's agreement that SSAC would be the primary source of the HBS products, Sonic Solutions and SSAC directed their customers to DPI for product repairs covered by HBS product warranties.

**D.      SSAC's Business Grows Rapidly Into the Early Part of 2021.**

40.     In 2018, Sonic Solutions sold over $470,000 in HBS products.

41.     In 2019, Sonic Solutions and then, after its merger with ACUS, SSAC, collectively sold nearly $600,000 in HBS products.

42.     In 2020, SSAC sold over one million dollars in HBS products.

43.     On information and belief, SSAC and its predecessor entities were, at all relevant times, responsible for more than 80% of DPI's HBS sales.

**E.      Defendants Surreptitiously Use Confidential SSAC Customer Information to Undercut SSAC and Move Customers to DPI.**

Plaintiffs are informed and believe, and upon such information and belief, state that:

44.     Shortly after the parties created SSAC with the understanding that it would leverage and expand their predecessors' client base to distribute HBS products, Defendant

Trigiani, unbeknownst to SSAC or its related entities, created an internal marketing group within DPI whose goal was to capture and directly market to those clients.

45.     Thereafter, and beginning at least by early 2020, when SSAC would refer customers to DPI for product repairs pursuant to the parties' warranty process, DPI personnel under the direction of Defendant Trigiani solicited those customers to purchase directly from DPI rather than SSAC.

46.     Because of confidential information that Sonic Solutions provided in reliance upon the DPI Noncompete and other DPI assurances, DPI also had access to SSAC pricing information. Defendants used that information in their solicitations to undercut SSAC prices.

47.     In early 2020, Defendant Trigiani retained an associate to approach Mr. Taylor of SSAC.  That associate was successful in obtaining from SSAC, and providing to DPI, a copy of the SSAC form of dealer agreement and SSAC dealer training materials.

48.     From those materials, DPI was aware of the discounts off manufacturer's suggested retail price ("MSRP") that SSAC offered to its dealers as well as a provision within the dealer agreements that prohibited the dealer from selling ultrasonic algae control products, other than those distributed by SSAC, for two years following the termination of the agreement.

49.     Armed with this knowledge, DPI offered discounts off MSRP to SSAC's dealers in excess of what SSAC offered, effectively foregoing profit in an effort to induce a breach of these dealers' contracts with SSAC.

50.     In or around February 2020, Defendant Trigiani, without SSAC's knowledge but using confidential SSAC client information, met with key SSAC international customers in Oslo, Norway and in Prague, Czech Republic and successfully persuaded them, in substantial part by undercutting SSAC's prices, to purchase directly from DPI.

51.     Among the other clients that Defendants usurped was Algaefree of Australia, which now purchases directly from DPI but still advertises its HBS products, at least in part, as SonicSolutions products.

52.     On or before April 9, 2021, DPI's inside sales person Paul Woods solicited SSAC's key customer, KLM.

53.     On or around May 3, 2021, Paul Woods of DPI contacted Les Traitments BioBac, Inc., a signed SSAC dealer, to provide pricing on HBS units that undercut SSAC prices. A true and accurate copy of Les Traitments BioBac's signed Dealer Sales Agreement is attached hereto as Exhibit 4.

54.     In May, 2021, the Long Pond Clean Waters Committee ("LCPCW") returned four HBS Quattros and related accessories it had recently purchased from SSAC after LPCWC discussions with DPI.

**F.      Defendants Financially Squeeze SSAC To Further Its Efforts To Put SSAC Out of Business.**

55.     On information and belief, on or before March 17, 2021, without notice to SSAC, DPI stopped including, in shipments of products to SSAC customers, the SonicSolutions Algae Control branded HBS User Manual and replaced it with a nearly identical manual that had all references to SSAC removed and replaced with DPI.

56.     By mid-April, 2021, SSAC had outstanding several purchase orders it had submitted to DPI in reliance upon its longstanding credit, discount, and payment terms.

57.     On April 19, 2021, however, Defendant Trigiani informed SSAC that DPI was unilaterally changing the price list, discount level, and payment terms of its arrangement with SSAC "effectively immediately." DPI stated that, henceforth, it would ship products only when SSAC's account was current and after each item was prepaid.

58.     SSAC, in need of product to service its customers during the 2021 algae season, responded by offering to prepay for additional units and arranged for the payment of their balance, notwithstanding that such payment was not due under the terms to which the parties had agreed and operated.

**G.      DPI Then Refuses to Honor SSAC Purchase Orders.**

59.     On April 23, 2021, DPI confirmed that it received a wire transfer of $10,958 from SSAC as prepayment for three units that DPI had represented were ready to ship.

60.     On April 26, 2021, DPI confirmed that it received SSAC's wire transfer of $25,983 to pay off current invoices (which, according to their written terms, were not yet due).

61.     On that same day, after receiving the wire transfers, DPI notified SSAC that all of its purchase orders, other than the three which had been prepaid, were "rejected." A true and accurate copy of that correspondence is attached hereto as Exhibit 5.

62.     On that same day, almost immediately after DPI confirmed receipt of the wire transfers, Defendant Trigiani notified SSAC that, effective immediately, DPI would not sell any products to SSAC. A true and accurate copy of that correspondence is attached hereto as Exhibit 6.

63.     SSAC submitted six (6) purchase orders to DPI, on or before April 26, 2021, that DPI continues to refuse to fulfill. True and accurate copies of those purchase orders are attached hereto as Exhibit 7.

64.     DPI's refusal to supply HBS products in fulfillment of purchase orders included a purchase order for a SolaRaft™ - Single Quattro that SSAC submitted for the Placer County Water Agency on or around April 20, 2021.

65.     On information and belief, a representative of DPI then contacted the Placer County Water Agency and sold it the SolaRaft™ - Single Quattro directly.

66.     On May 17, 2021, Placer County Water Agency contacted SSAC to cancel its order for a SolaRaft™ - Single Quattro, which order SSAC had been unable to fulfill due to DPI's actions.

67.     SSAC is currently unable to supply its customers with product and cannot survive without access to the HBS products.

**H.     DPI Cuts Out SSAC in the Warranty Process on Products Previously Sold to SSAC.**

68.     By agreement of the parties, SSAC had been responsible for helping customers resolve warranty issues with the HBS products and obtaining and completing Return Material Authorization ("RMA") forms.

69.     Until early March, 2021, shipments of HBS units included the HBS User Manual that informed consumers that, "In order for a claim to be processed, you must call SonicSolutions Algae Control . . . to obtain a Return Material Authorization (RMA) number and accompanying RMA form." *See* Ex. 2 at 39.

70.     The HBS User Manual included in hundreds of shipments of HBS units further directs consumers to "please call SonicSolutions Algae Control" "[f]or Customer Service, and to request an RMA or obtain Return Information." Ex. 2 at 40.

71.     Customers have relied on SSAC to assist them in completing RMA forms and resolving warranty issues.

72.     On April 27, 2021, DPI informed SSAC that DPI's Warranty departments would no longer communicate with SSAC, and that customers with warranty issues should be directed

to contact DPI directly. A true and accurate copy of this correspondence is attached hereto as Exhibit 8.

73.     If SSAC is unable to communicate with dealers, customers, or DPI concerning warranty issues, its reputation, and its long-cultivated relationships with dealers and customers, will be irreparably harmed.

**I.     DPI's Actions Interfered With, and Were Intended to Interfere With, SSAC's Prospective Business Relationship With a Key Investor.**

74.     On December 31, 2020, SSAC executed a Letter of Intent with a third party, AlgaeSonix. On information and belief, AlgaeSonix intended to invest in excess of two million dollars in SSAC.

75.     On information and belief, throughout the year 2021, DPI was aware that AlgaeSonix was intending to invest in SSAC.

76.     In March 2021, SSAC attempted to facilitate the fulfillment of Purchase Order 301 placed by AlgaeSonix with DPI, which included orders for the particularly valuable "Quattro" HBS algae control systems.

77.     Purchase Order 301 sought $648,798.75 of HBS products.

78.     DPI accepted Purchase Order 301 on March 8, 2021.

79.     Throughout March and April 2021, SSAC corresponded with DPI concerning Purchase Order 301 in an effort to coordinate the fulfillment and shipping of that Purchase Order.

80.     DPI shipped only several, lower-value Mezzo units. As of April 26, 2021, DPI had fulfilled less than 1/3 of Purchase Order 301.

81. In a letter dated April 26, 2021, Defendant Trigiani informed SSAC that DPI would not supply any further algae management products to AlgaeSonix. *See* Exhibit 6.

82. Defendants' actions, including but not limited to their breach of the DPI Noncompete, their breach of DPI's distributorship agreement with SSAC, their surreptitious taking of SSAC's customers, their cessation, without notice, of supplying SSAC with the sole product it marketed and sold, and their refusal to honor an AlgaeSonix purchase order because of its relationship with SSAC, have devalued SSAC's business and prevented SSAC from completing its business deal with AlgaeSonix.

**J. DPI Defamed SSAC While Directly Contacting Its Dealers and Customers.**

83. On and after April 26, 2021, DPI issued a Hydro Bioscience Ownership, Distribution and Sales Clarification Notice (the "Notice"). A true and accurate copy of this Notice is attached hereto as Exhibit 9.

84. On information and belief, such Notice was sent directly to, and only to, Plaintiffs' dealers and clients, including but not limited to KLM, Maryland Biochemical Co., and ESCMQ. A true and accurate copy of correspondence sent to ESCMQ from DPI is attached hereto as Exhibit 10.

85. The Notice includes a statement that, "It has come to our attention that the sales, distribution and ownership of DPI's Hydro Bioscience product line may have been misrepresented in the marketplace . . ."

86. The Notice includes a statement that "DPI is the owner of its HBS products. . . and customer support and no other person has a right thereto or an interest therein."

87. The above statement is false.

88.     SSAC "owns," and/or has a right and interest in, HBS's products' customer support.

89.     Documents DPI provided to end users of its HBS products had instructed those customers to contact SSAC for customer service. Ex. 2 at 39.

90.     SSAC submitted at least four RMAs in April 2021, as part of its ongoing effort to provide customer support. It had an interest in the resolution of those claims.

91.     The Notice includes a statement that "DPI is the owner of its HBS products. . . and no other person has a right thereto or an interest therein."

92.     The above statement is false.

93.     SSAC owned and owns the HBS products that it purchased from DPI.

94.     The Notice included a statement that "DPI is not bound by any exclusivity arrangement in North America, South America, Africa, Australia, or Asia."

95.     The above statement is false.

96.     DPI previously represented to a then-prospective client in Uruguay, which is located in South America, that SSAC was the only company authorized to sell and distribute DPI's HBS products. *See* Ex. 3.

97.     The Notice encourages the addressee to contact DPI directly to order HBS products.

98.     Statements in the Notice indicate that SSAC has misrepresented its relationship to DPI and its role as a distributor of HBS technology.

99.     Such statements are false.

100.    SSAC has not misrepresented its relationship to DPI or its role as a distributor of HBS technology.

101. Because the Notice was sent only to SSAC's clients, all of whom had previously received HBS products from SSAC and/or executed agreements with SSAC concerning the distribution of HBS products, DPI knew or should have known that such recipients would understand that the Notice referred to SSAC, and only to SSAC.

102. The false statements in the Notice had the effect of injuring SSAC's reputation and have caused it economic harm.

**K.    SSAC Cannot Fulfill Orders Without Access to Its Product.**

103. SSAC's contracted dealers and prospective customers typically order product for delivery in between April and August, when algae growth is most robust in the northern hemisphere.

104. SSAC has six purchase orders that are pending and were pending when DPI breached its agreement with SSAC by terminating supply of HBS product without any advanced notice. *See* Ex. 7. SSAC does not have sufficient supplies to fulfill these orders.

105. SSAC received additional orders from dealers and customers in April 2021, and continues to receive orders from dealers and customers, that it is now not able to fulfill.

106. SSAC had at least three prospective relationships with high-value clients.

107. SSAC has a prospective sale in Uruguay, to Obras Sanitarias del Estado.

108. On information and belief, DPI was and is aware of this prospective sale. A true and accurate copy of a letter DPI wrote to Obras Sanitarias del Estado concerning this proposed project is attached hereto as Exhibit 3.

109. This sale, if consummated, would result in the sale of HBS products with an MSRP value in excess of $900,000.

110.    SSAC has a pending sale in Ecuador.  This customer has placed an order for approximately $250,000 of HBS products.

111.    SSAC has a prospective sale to a customer in the Philippines.  SSAC's proposal, which is under consideration, is for the sale of 25 HBS pontoons.  This order, if accepted, would result in the sale of HBS products with an MSRP value in excess of $800,000.

112.    SSAC expects an economic benefit from each of these prospective deals.

113.    On information and belief, under each of these deals, Defendants would also reap substantial financial benefit and is preventing the deal from being consummated only to substantially and irreparably harm SSAC.

114.    Because DPI unreasonably terminated the supply of product without any advance notice, SSAC cannot procure a substitute supply during this algae season.

115.    Furthermore, because SSAC's business model has been focused on marketing, promoting, selling, and servicing only DPI HBS products, SSAC's customers are not likely to accept a substitute supply of products.

116.    SSAC, along with and through its predecessor entities, has cultivated long-standing relationships with its dealers and customers.

117.    Maryland Biochemical Co., for example, has relied on SSAC and its predecessor entities for more than a decade to supply it with algae management technology.

118.    SSAC has already lost sales to long-time customers, including a sale of $200,000 worth of HBS products to Aquarion, as a result of DPI's actions.

119.    SSAC has already lost sales to first-time customers, including Placer County Water Agency,  as a result of DPI's actions.

120.    On average, SSAC needs approximately six months from initial client contact to complete a purchase.

121.    If SSAC continues to be unable to fulfill pending orders, its reputation, and its relationship with its dealers and customers, will continue to be irreparably harmed and likely ruined.

122.    SSAC does not have sufficient financial reserves to endure an entire algae season without a supply of products to sell.

123.    Absent immediate relief, SSAC will likely go out of business.

## COUNT I
### Tortious Interference with Prospective Business Relationships

124.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth in this count of the Complaint.

125.    Plaintiffs had advantageous relationships with third parties, including Maryland Biochemical Co., Aquarion, KLM, AlgaeSonix, and others, which created a probability of future economic benefit for Plaintiffs.

126.    DPI intentionally induced the breaking of these relationships by abruptly terminating its supply of HBS products to Plaintiffs without providing reasonable notice.

127.    DPI intentionally induced the breaking of these relationships by preventing Plaintiffs from being able to fulfill pending purchase orders.

128.    DPI intentionally induced the breaking of these relationships by contacting Plaintiffs' dealers and customers and offering to sell HBS products to them directly.

129.    The interference of DPI with Plaintiffs' prospective business relationships was intentional and improper in motive and in means.

130.    Plaintiffs were irreparably harmed and will continue to be irreparably harmed by DPI's action in interfering with Plaintiffs' prospective business relationships.

**COUNT II**
**Tortious Interference with Contractual Relations**

131.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth in this count of the Complaint.

132.    Plaintiffs has written contracts with third party dealers, including but not limited to Maryland Biochemical Co., KLM, Les Traitments BioBAC, and T.A.S.O.

133.    DPI knowingly interfered with Plaintiffs' contracts with its dealers by actions including preventing Plaintiffs from being able to supply the HBS items requested by Plaintiffs' contracted dealers.

134.    DPI's interference, in addition to being intentional, was and is improper in motive and means.

135.    Plaintiffs were irreparably harmed and will continue to be irreparably harmed by DPI's action in interfering with Plaintiffs' contractual relations.

**COUNT III**
**Intentional Interference with Contractual Rights**

136.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth in this count of the Complaint.

137.    Plaintiffs have written contracts with third party dealers, which include a termination provision that requires at least sixty days' notice to SSAC, as well as a two-year prohibition on selling ultrasonic algae eliminators "other than the ones distributed by SSAC" for a period of two (2) years following termination of the contract.

138. DPI knowingly interfered with these contracts by preventing such third party dealers from performing under their contract with SSAC, specifically by making it impossible for those third parties to comply with the reasonable termination provisions of such contracts and to fulfill their active or pending purchase orders.

139. Plaintiffs were irreparably harmed and will continue to be irreparably harmed by DPI's action in interfering with Plaintiffs' contractual relations.

## COUNT IV
### Violations of M.G.L. c. 93A, § 11

140. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth in this count of the Complaint.

141. All parties are engaged in the conduct of trade or commerce as defined in Mass. G.L. ch. 93A, §§ 2 and 11.

142. Defendants' conduct, as described herein, constitutes unfair and/or deceptive acts or practices that are in violation of Mass. G.L. ch. 93A, §§ 2 and 11.

143. Defendants' conduct, described above, occurred primarily in Massachusetts.

144. Defendants' use or employment of the unfair and/or deceptive acts or practices was willful and/or knowing.

145. As a direct and proximate consequence of Defendants' unfair and/or deceptive acts or practices, Plaintiffs have suffered and will continue to suffer loss and irreparable injury.

## COUNT V
### Breach of Contract

146. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth in this count of the Complaint.

147. An implied-in-fact contract exists between the parties, whereby DPI would supply Plaintiffs with HBS products.

148. This contract required reasonable notice before its termination.

149. DPI breached the contract by terminating the contract without providing reasonable notice to Plaintiffs, and without giving Plaintiffs adequate time to locate a substitute supplier and manufacturer of its products.

150. As a result of this breach, Plaintiffs have been harmed and will continue to be irreparably harmed.

## COUNT VI
### Breach of DPI Noncompete

151. The DPI Noncompete is a valid agreement binding on DPI.

152. DPI materially breached this agreement by using Plaintiffs' confidential customer information to contact and directly solicit these customers.

153. As a result of DPI's breach of this contract, Plaintiffs have been harmed.

154. By the DPI Noncompete's own terms, Plaintiffs are entitled to injunctive relief under these circumstances without placing a bond.

## COUNT VII
### Injunctive Relief Pursuant to G.L. c. 266, § 91

155. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth in this count of the Complaint.

156. DPI advertises its HBS products through "Testimonials."

157. A true and accurate copy of HBS's "Testimonials" page, as it appeared on June 1, 2021, is attached hereto as Exhibit 11 ("Testimonials Page").

158.    DPI, in the Testimonials Page, represents that the photographs, labelled "Before" and "After" are images of Cumberland Harbor in St. Mary's Georgia.

159.    DPI, in the Testimonials Page, represents that the photographs labelled "Before" and "After" are "real world examples" of the algae management systems sold by DPI's HBS division.

160.    These representations are false.

161.    The photographs on the Testimonials Page, labelled "Before" and "After," are images of Rockland Country Club in Rockland, New York.

162.    The "Before" photograph on the Testimonials Page was taken in 2004, by agents of Rockland Country Club.

163.    The "After" photograph on the Testimonials Page was taken in or around 2004, by an employee or agent for Sonic Solutions, LLC.

164.    DPI's HBS technology did not exist in 2004.

165.    The photographs on the Testimonials Page show examples of the algae management systems sold by Sonic Solutions in early 2004.

166.    General Laws Chapter 266, section 91 provides that any party aggrieved by false advertising may seek equitable relief.

167.    Sonic Solutions is aggrieved by DPI's false advertising, in that DPI has misappropriated Plaintiff's intellectual property in order to deceive consumers.

168.    As a result, Plaintiffs seek injunctive relief requiring DPI to discontinue its false advertising and remove all instances of false statements from the Testimonials Page.

## COUNT VIII
### Defamation

169. Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as if set forth in this count of the Complaint.

170. DPI and Defendant Trigiani published the Hydro BioScience Ownership, Distribution and Sales Clarification Notice (the "Notice") on and after April 26, 2021.

171. The Notice contains statements that are false and which tend to injure SSAC's reputation.

172. Defendants knew, or should have known, that the published statements are false and injurious to the reputation of Plaintiffs.

173. Defendants' publication of this Notice, the false statements therein, and other false statements by Defendants have caused Plaintiffs economic harm, including but not limited to the loss of prospective sales.

## V.   PRAYER FOR RELIEF

WHEREFORE, due to the ongoing, severe, and irreparable injury to Plaintiffs caused by Defendants' unfair acts and practices targeted to put Plaintiffs out of business, including but not limited to their misappropriation of Plaintiffs' customer information, their interference with Plaintiffs' business and contractual relationships, their failure to provide reasonable notice before terminating their implied-in-fact contract with SSAC, and their breach of the DPI Noncompete, Plaintiffs respectfully request that this Honorable Court order the following relief, including a temporary restraining order and a preliminary injunction as stated:

1. That Defendants, their agents, servants, and employees, and all persons acting under their permission and authority be immediately enjoined and restrained for at least the remainder of 2021 from:

a. refusing or otherwise failing to timely fulfill orders for HBS products from SSAC or its affiliate entities consistent with the practices among the parties as of January 1, 2020;

   b. stating or implying to any SSAC customer to which it has provided HBS products that SSAC is not to be involved in the warranty process for such products or refusing to cooperate with SSAC in fulfilling any such warranty in substantial compliance with the warranty service process employed by DPI and SSAC as of January 1, 2020;

   c. stating or implying to any party that SSAC or its affiliated entities are not authorized to sell, service, or otherwise fulfill orders for any HBS product;

   d. contacting any SSAC customer for any purpose related to HBS products or otherwise except as authorized in writing by SSAC; or

   e. using any SSAC customer or pricing information for any purpose whatsoever except as SSAC may authorize in writing.

2. Entry of judgment, on all counts, in favor of Plaintiffs;

3. An award of monetary damages, including, but not limited to, actual, incidental and consequential damages, treble damages, attorneys' fees, interests, and costs;

4. Such other relief that the Court deems just and proper.


**THE PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.**

## VERIFICATION

I, Dana G. Taylor, declare under the pains and penalties of perjury that I have reviewed

the foregoing complaint, that I authorize its filing, and that the allegations set forth

therein are true and accurate to the best of my knowledge.

_____
Dana G. Taylor

3477940v6

PLAINTIFFS,
**SONICSOLUTIONS ALGAE CONTROL, LLC.,**
**SONIC SOLUTIONS, LLC, and**
**ALGAECONTROL.US LLC**

By Their Attorneys,

 */s/ James C. Duda*
James C. Duda, Esq. (BBO # 551207)
Lauren C. Ostberg, Esq. (BBO # 696883)
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115-5507
Tel. (413) 272-6286
jduda@bulkley.com
lostberg@bulkley.com

Dated: June 9, 2021