UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SONICSOLUTIONS ALGAE CONTROL, LLC, | ) | Civil Action No. |
| SONIC SOLUTIONS, LLC, and | ) | |
| ALGAECONTROL.US LLC, | ) | |
| | ) | **Memorandum in** |
| **Plaintiffs,** | ) | **Support of Temporary** |
| | ) | **Restraining Order and** |
| v. | ) | **Motion for Preliminary** |
| | ) | **Injunction** |
| DIVERSIFIED POWER INTERNATIONAL, LLC, | ) | |
| and ANTONIO TRIGIANI, | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiff SonicSolutions Algae Control, LLC ("SSAC"), and its co-owners and

predecessors in interest, Sonic Solutions, LLC ("Sonic Solutions") and AlgaeControl.US LLC

("ACUS"), bring this motion for the Court's intervention to prevent the imminent demise of their

business, which will likely occur unless the Court orders Defendant Diversified Power

International, LLC ("DPI"), the sole supplier of Plaintiffs' ultrasonic algae control products, to

immediately honor Plaintiffs' purchase orders and cease interfering with Plaintiffs contractual

relations and other business relationships. To that end, and for the reasons stated in this

memorandum, Plaintiffs have moved, pursuant to Fed. R. Civ. P. 65, for the issuance of a

temporary restraining order or, in the alternative, a preliminary injunction requiring Defendants

to immediately honor Plaintiffs' purchase orders pursuant to the parties' established business

practices and to enjoin Defendants' from further tortious interference with Plaintiffs' business

relationships.

# I.   STATEMENT OF FACTS

## A.   Sonic Solutions and DPI Begin a Relationship Founded on an Express Commitment Not To Use the Other Party's Confidential Information to Compete with It.

Dana Taylor and his partners created Sonic Solutions on May 13, 2002 as a dealer of ultrasound devices used to control algae growth in water bodies. Doc 1, Verified Complaint for Injunctive Relief and Damages (hereinafter "Ver. Compl."), ¶ 9.[1]  In 2012, after Sonic Solutions had developed an extensive network of dealers, DPI's owner, Defendant Antonio Trigiani, and Mr. Taylor began discussing the possibility of DPI providing components for ultrasound products that Sonic Solutions offered.  *See id.* at ¶¶ 10-12.   At that time, DPI did not manufacture ultrasound algae control products.

In an agreement effective May 8, 2012 (the "DPI Noncompete"), each party expressly agreed "to maintain and keep as confidential all information received from the other and not to use such information to compete directly or indirectly with the other."[2]  *Id.* at ¶¶ 12-13, Ex. 1. They each recognized that the other party would "incur irreparable damage" if a party breached the DPI Noncompete and agreed that the other party would be entitled to an injunction restraining any such breach, without the need to post a bond.  Ver. Compl. ¶ 14, Ex. 1. The obligations under the DPI Noncompete were to continue until three years "after the termination of any vendor (DPI)/Buyer (Sonic) relationship." *Id.*

---

[1] The Verified Complaint for Injunctive Relief and Damages, filed on June 9, 2021, was verified by SSAC's President and Managing Director, Dana G. Taylor.

[2] All non-public information that a party received was to be deemed confidential unless it was previously known by the party; was disclosed to the party by a third party not in violation of an obligation of confidentiality; became generally known without fault of the party; was developed independently by the party without reliance on the information; or its disclosure was required by law. *See* Ex. 1 at 1.

**B.    George Hutchinson Develops a Superior Ultrasound Algae Control Technology for DPI.**

On December 2, 2013, Defendant Trigiani met with George Hutchinson, the owner of what is now ACUS and an engineer familiar with ultrasound technology. Hutchinson Aff. ¶¶ 2-3. Mr. Hutchinson subsequently designed the operating specifications of the ultrasound devices that would be manufactured and marketed as the "Mezzo" and the "Quattro" within DPI's new Hydro BioScience ("HBS") ultrasound product line.  Hutchinson Aff. ¶ 4. The HBS products were superior to other ultrasound algae control products then available in the market. *Id.* at ¶ 5.  Mr. Hutchinson's company, ACUS, began to supply its customers with DPI's HBS products in May 2016, Hutchinson Aff. ¶ 6,  and Sonic Solutions began to market these products to its clients in or about March 2018.  Ver. Compl. ¶ 21.

**C.    With DPI's Support, Sonic Solutions and ACUS Become SSAC, Which Builds Its Identity Upon the Marketing, Sale, and Service of HBS Products and Devotes Itself Exclusively to Marketing and Distributing DPI's HBS Products.**

Sonic Solutions soon thereafter ceased manufacturing its own product and transitioned to marketing and selling DPI's HBS Products. Ver. Compl. ¶ 22.  Beginning in the fall of 2018, Defendant Trigiani, Mr. Taylor, and Mr. Hutchinson had a series of discussions about combining Sonic Solutions, ACUS, and DPI's HBS division into a new entity to market the new HBS products. Ver. Compl. ¶¶ 23-26. Defendant Trigiani subsequently declined to join the partnership and instead encouraged Mr. Taylor and Mr. Hutchison to create their own entity, agreeing that it would be the primary distributor of DPI's HBS product line. Ver. Compl. ¶¶ 23-26.

The parties took numerous actions to manifest this understanding. On May 6, 2019, Sonic Solutions and ACUS created SSAC, headquartered in Northampton, Massachusetts, solely to distribute DPI's HBS products. Ver. Compl. ¶¶ 25-26. Sonic Solutions and ACUS each then transitioned their respective dealerships to SSAC dealerships selling HBS products. Ver. Compl.

¶ 22; Hutchinson Aff. ¶ 7.  Defendants similarly took specific actions that affirmed the parties'
understanding that SSAC was the primary distributor of DPI's HBS products. These included
promoting the "SonicSolutions Algae Control" brand as the commercial identity of HBS
products. For example, the user manual that DPI produced for the HBS products was branded
"**SonicSolutions ALGAE CONTROL**" on its cover  (the "HBS User Manual"). *See* Ex. 2. The
HBS User Manual directed purchasers to contact SSAC for "Customer Service," "Return
Information," and "product updates, technical information, or general inquiries." *See* Ex. 2 at 39,
40; *see also* Taylor Aff, ¶¶ 28-30. The HBS User Manual also directed customers to process all
warranty claims through SSAC. Ex. 2 at 39, 40. DPI included the SSAC branded HBS User
Manual with shipments of HBS products to SSAC customers. Ver. Compl. ¶ 33.

SSAC heavily invested time and money in marketing and developing the commercial
reputation of HBS technology and products. Ver. Compl. ¶ 34. This included extensive and
exclusive marketing of the HBS products to its large client base built up by it and its parent
companies, Sonic Solutions and ACUS. Ver. Compl. ¶¶ 35-36. Many of these client relationships
involved contracts that committed the clients to purchasing HBS products solely from SSAC.
Ver. Compl. ¶ 37. In reliance on the DPI Noncompete and on DPI's agreement that SSAC would
be the primary distributor of HBS products, Sonic Solutions and SSAC shared the identities and
contact information of its clients with DPI so that DPI could "drop ship" products directly to
SSAC clients. Ver. Compl. ¶ 38. In further reliance on their agreements with DPI, Sonic
Solutions and SSAC directed their customers to DPI for product repairs, covered by HBS
product warranties, that SSAC managed. Ver. Compl. ¶ 39.

**D.   Unbeknownst to Plaintiffs, DPI Surreptitiously Undercut SSAC to Take Its Clients.**

While profiting from SSAC's marketing, dealership network, and sales, Defendant Trigiani, without Plaintiffs' knowledge, began a marketing group within DPI in 2020 whose goal was to convert SSAC clients to direct DPI clients. Morgan Aff. ¶ 2 . The effort relied upon confidential customer and pricing information provided by SSAC in reliance upon the DPI Noncompete.  *See* Morgan Aff. ¶ 4; Ver. Compl. ¶ 38. The effort also involved the use of an associate retained by Defendant Trigiani to approach Mr. Taylor, under the guise of becoming an SSAC dealer, to obtain copies of the SSAC dealer agreement and dealer training materials. Morgan Aff. ¶ 15; *see also* Ver. Compl. ¶¶ 47-49. Among other things, those materials provided Defendants with the discounts off manufacturer's suggested retail price ("MSRP") that SSAC offered its dealers. Morgan Aff. ¶ 14. The SSAC dealer agreement also made clear that dealers were expressly prohibited from selling ultrasonic algae products, not distributed by SSAC, for two years following the termination of the agreement. Ver. Compl. ¶ 48. Notwithstanding the noncompetition clauses in the DPI Noncompete and SSAC dealer agreements, DPI used the client and pricing information to offer discounts off MSRP to SSAC's dealers in excess of what SSAC offered, Morgan Aff. ¶¶ 13-14, effectively inducing a breach of the dealers' SSAC contracts.

One example of this occurred in or around February 2020, when Defendant Trigiani met with key SSAC international customers in Oslo, Norway and in Prague, Czech Republic and successfully persuaded them, in substantial part by undercutting SSAC's prices, to purchase directly from DPI.  Morgan Aff. ¶¶ 10-11.  This effort of usurpation apparently accelerated more recently, with other examples including:

a.   Algaefree of Australia, which now purchases directly from DPI. Morgan Aff. ¶16.

b. KLM, SSAC's key customer that, on or before April 9, 2021, was solicited by DPI's inside sales person Paul Woods. *See* Hutchinson Aff. ¶ 8 and Exhibit A thereto.

c. Les Traitments BioBac, Inc., a signed SSAC dealer that Mr. Woods contacted on or around May 3, 2021 to provide pricing on HBS units that undercut SSAC prices. *See* Hutchinson Aff. ¶  and Exhibit B thereto. *See also* Ex. 4 (signed copy of Les Traitments BioBac's signed Dealer Sales Agreement); Ver. Compl. ¶ 53 (authenticating Ex. 4).

d. Long Pond Clean Waters Committee ("LCPCW") that, in May, 2021, returned four HBS Quattros and related accessories it had recently purchased from SSAC after LPCWC discussions with DPI. Assael Aff. ¶¶ 6-9.

In addition, in or about March 2021, without informing SSAC, DPI removed all references to SSAC from the HBS User Manual that DPI shipped with HBS products and replaced the references with references to DPI. *See* Morgan Aff. ¶ 17.

**E.   DPI Uses SSAC Client Information to Defame SSAC to Its Customers.**

On and after April 26, 2021, DPI issued a "Hydro Bioscience Ownership, Distribution and Sales Clarification Notice" (the "Notice").  *See* Ver. Compl. ¶ 83, Ex. 9.  The Notice states, "It has come to our attention that the sales, distribution and ownership of DPI's Hydro Bioscience product line may have been misrepresented in the marketplace . . ." Such Notice was sent directly to Plaintiffs' dealers and clients, such as EMCSQ, and Plaintiffs are unaware of any party other than SSAC customers to which the Notice was sent. Ex. 10.  *See* Ver. Compl. ¶ 84, Taylor Aff. ¶ 6. The Notice contains several demonstrably false statements that customers for which SSAC was the sole supplier necessarily would understand refer to SSAC. These include the following:

- a statement that "DPI is the owner of its HBS products. . . and customer support and no other person has a right thereto or an interest therein."  *See* Ex. 9. This is false in at least two respects:

  o SSAC owned the HBS products that it purchased from DPI and sold to its customers. Ver. Compl. ¶ 93.

  o SSAC "owns," and/or has a right and interest in, HBS's products' customer support. *See* Ex. 2 at 39 (SSAC's interest in customer service). Documents DPI itself provided to end users of HBS products had instructed those customers to contact SSAC for customer service. Ex. 2 at 39. By way of example, SSAC submitted at least four Return Material Authorizations ("RMAs") in April 2021 as part of its customer support. Ver. Compl. ¶ 90.  SSAC certainly has an interest in that customer support and the resolution of those claims.

- a statement that "DPI is not bound by any exclusivity arrangement in North America, South America, Africa, Australia, or Asia." This statement is false. DPI itself previously represented to a prospective client in Uruguay, which is located in South America, that SSAC was the only company authorized to sell and distribute DPI's HBS products.  *See* Ex. 3 (DPI letter confirming that SSAC is exclusive distributor in Uruguay).

- statements that indicate SSAC has misrepresented its relationship to DPI and its role as a distributor of HBS technology. Ver. Compl. ¶ 98; *see* Ex. 9.  These statements are false. SSAC has never misrepresented its relationship to DPI or its role as a distributor of HBS technology. Ver. Compl. ¶ 100.

The evidence will show that, because the Notice was sent only to SSAC's clients, all of whom had previously received HBS products from SSAC and/or executed agreements with SSAC

concerning the distribution of HBS products, DPI had to know that such recipients would understand that the Notice and its defamatory statements referred to SSAC, and only to SSAC.

**F.   Defendants Financially Squeeze SSAC.**

By mid-April, 2021, SSAC had several purchase orders outstanding that it had submitted to DPI in reliance upon their longstanding credit, discount, and payment terms. On April 19, 2021, however, Defendant Trigiani informed SSAC that DPI was unilaterally changing the price list, discount level, and payment terms for SSAC "effectively immediately." *See* Ex. A to Taylor Aff.  DPI stated that, henceforth, it would ship products only when SSAC's account was current and after each item was prepaid. *Id.*; Ver. Compl. ¶ 57. SSAC, in desperate need of product for its customers during the 2021 algae season, responded by offering to prepay for additional units and arranged for the payment of its balance, notwithstanding that such payment was not due under the terms to which the parties had agreed and operated.  Ver. Compl. ¶ 58.

**G.   DPI Outright Refuses to Honor SSAC Purchase Orders.**

Despite SSAC paying its balance and prepayments in accordance with DPI's new terms, DPI informed SSAC on April 26, 2021 that it was rejecting all of SSAC's purchase orders, except for three that had then been prepaid. Ver. Compl. ¶¶ 59-61; *see* Ex. 5. On that same day, Defendant Trigiani notified SSAC that, effective immediately, DPI would no longer sell any products to SSAC. Ver. Compl. ¶ 62; Ex. 6. DPI then rejected six (6) purchase orders from SSAC, one of which included a purchase of a SolaRaft™ - Single Quattro for the Placer County Water Agency. On May 17, 2021, the Agency contacted SSAC to cancel its order for a SolaRaft™ - Single Quattro. Ver. Compl. ¶ 66. SSAC was informed that DPI had filled that order directly. Ver. Compl. ¶65.

By way of further example, Sonic Solutions has been doing business with the Aquarion Water Company ("Aquarion"), one of the largest water utility enterprises in the Northeast US, for over 10 years. SSAC had been working on a specific order over a 6 month period in collaboration with one of its dealers, Maryland Biochemical, to sell 12 SolaRafts (with associated equipment) to Aquarion, with a sale value of approximately $202,000. Assael Aff. ¶¶ 11-12.  After the deal was sealed, Maryland Biochemical asked SSAC to satisfy the order, which, due to DPI's actions, SSAC could no longer do.  *Id.* at ¶ 13.  Maryland Biochemical had no choice but to go direct to DPI, as the only viable way to transact and support the sale.  Assael Aff ¶ 14.

DPI's actions continue to affect its pending and potential orders. These include, by way of example only, a $250,000 order for HBS units from a customer in Ecuador, a nearly $1 million purchase by a Uruguayan water authority, and a prospective sale to a customer in the Philippines for 25 HBS pontoons valued in excess of $800,000.  Ver. Compl. ¶¶107-111.

**H.   DPI Prevents SSAC from Providing Adequate Customer Service to Its Customers.**

By agreement of the parties, SSAC had been responsible for helping customers resolve warranty issues with HBS products and obtaining and completing Return Material Authorization forms. Until early March, 2021, shipments of HBS units included the HBS User Manual that informed consumers that, "In order for a claim to be processed, you must call SonicSolutions Algae Control . . . to obtain a Return Material Authorization (RMA) number and accompanying RMA form."  *See* Ver. Compl. ¶ 31, Ex. 2 at 39. The HBS User Manual, included in hundreds of shipments of HBS units, further directed consumers to "please call SonicSolutions Algae Control" … "[f]or Customer Service, and to request an RMA or obtain Return Information."  *See*

Ver. Compl. ¶ 31, Ex. 2 at 40. Customers have relied on SSAC to assist them in completing RMA forms and resolving warranty issues.

On April 27, 2021, DPI informed SSAC that DPI's Warranty departments would no longer communicate with SSAC, and that customers with warranty issues should be directed to contact DPI directly. *See* Ver. Compl. ¶ 72, Ex. 8. DPI further informed at least one SSAC customer, the Long Pond Clean Waters Committee, which had previously purchased four HBS Quattros from SSAC, that it would not honor warranties on those products.  Assael Aff. ¶¶ 6-8. As a result of these communications, LPCWC returned these products to SSAC for a refund. Assael Aff. ¶ 9; *see* Ver. Compl. ¶ 54.

## I.   DPI Actions Interfere with SSAC's Prospective Business Relationships with a Key Investor.

On December 31, 2020, SSAC executed a Letter of Intent with a third party, AlgaeSonix, which intended to invest more than two million dollars in SSAC.  Field Aff. ¶ 2.  In March 2021, in connection with its pending business relationship with AlgaeSonix, SSAC attempted to facilitate the fulfillment of Purchase Order 301 placed by AlgaeSonix with DPI, which included orders for the particularly valuable "Quattro" HBS systems.  Ver. Compl. ¶ 76. This order, which sought $648,798.75 of HBS products, was accepted by DPI on March 8, 2021. Ver. Compl. ¶¶ 77-78. Throughout March and into April 2021, SSAC corresponded with DPI concerning Purchase Order 301 to coordinate the fulfillment and shipping of that Purchase Order. Ver. Compl. ¶ 79.  As of April 26, 2021, DPI had fulfilled less than 1/3 of Purchase Order 301, comprising only lower-value Mezzo units. Ver. Compl. ¶ 80.

On that date, Defendant Trigiani informed SSAC that DPI would not supply any further algae management products to SSAC *or* AlgaeSonix, because he, mistakenly, believed the parties had merged. *See* Ex. 6, Ver. Compl. ¶ 81. AlgaeSonix, maintaining its interest in SSAC

and anticipating that DPI necessarily would soon fulfill its contractual obligations, provided HBS

products to SSAC that it had previously obtained so that SSAC could fulfill at least some

customer orders during May to stay financially afloat.  Field Aff. ¶ 5.  That small inventory is

now depleted and, due to DPI's continued refusal to honor its commitments, cannot be replaced.

Consequently, AlgaeSonix's anticipated investment cannot now proceed and will not proceed if

SSAC becomes essentially worthless due to DPI's actions.  Field Aff. ¶ 7.

**J.  SSAC Currently Has No Alternative Source of Product To Keep the Company Viable.**

SSAC's contracted dealers and prospective customers typically order product for delivery

between April and August, when algae growth is most robust in the northern hemisphere. Ver.

Compl. ¶ 103.  Its typical sales cycle, from initial customer contact to completion of a purchase,

is approximately six months. Ver. Compl. ¶ 120; *see* Assael ¶ (nine months to a year). Because

SSAC's business model has been focused on marketing, promoting, selling, and servicing only

DPI HBS products, SSAC's customers will not accept a substitute product at this late date.  Ver.

Compl. ¶ 115. Thus, because DPI terminated its supply of product without any advance notice,

SSAC cannot procure a substitute supply for this algae season. Ver. Compl. ¶ 114.

## II.  <u>ARGUMENT</u>

Plaintiffs are entitled to a temporary restraining order and preliminary injunction if they

show: 1) a risk of irreparable harm if the injunction is not issued; 2) a likelihood of success on

the merits; 3) the balance of equities favors an injunction; and 4) the public's interest will not be

adversely affected by the injunction. *See TEC Eng'g Corp. v. Budget Molders Supply, Inc.,* 82

F.3d 542, 544 (1st Cir.1996); *Hypertherm, Inc. v. Precision Products, Inc.,* 832 F.2d 697, 699 &

n. 2 (1st Cir.1987);  *see also Largess v. Supreme Judicial Court for Mass.*, 317 F.Supp.2d 77, 81

(D. Mass. 2004) (the "quadripartite standard" for a preliminary injunction is the same test that is

to be used in determining whether to grant a temporary restraining order).  The "sine qua non of this four-part inquiry is likelihood of success on the merits." *New Comm. Wireless Servs. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Given the locus of activities and damages in this matter, that likelihood of success is to be assessed under the substantive law of Massachusetts. *See Primarque Prod. Co. v. Williams W. & Witts Prod. Co.*, 988 F.3d 26, 32 (1st Cir. 2021) (citing *Performance Trans., Inc. v. Gen. Star Indem. Co.*, 983 F.3d 20, 24 (1st Cir. 2020)).

A. **Plaintiffs Are Likely to Succeed on the Merits.**

1. **The evidence will establish DPI breached the DPI Noncompete by using SSAC's confidential client and pricing information to solicit SSAC's customers.**

It is clear from the face of the DPI Noncompete that DPI agreed not to use non-public information received from Sonic Solutions to compete with it, directly or indirectly. Ex. 1. The obligations under the DPI Noncompete were to continue until three years "after the termination of any vendor (DPI)/Buyer (Sonic) relationship." *Id.* That relationship has not been terminated, at least not until recently, and DPI remains bound by its confidentiality obligations.

Among the confidential information that DPI has received from Sonic Solutions, and its affiliate SSAC, are the names and addresses of Sonic Solutions' actual and prospective customers and dealers. Ver. Compl. ¶ 38. SSAC included such information in its invoices as "drop ship" information provided to DPI so that it could ship HBS products ordered by SSAC directly to its customers.  *See, e.g.,* Ex. 7; Assael Aff. ¶ 7 and Exhibit A thereto.  DPI also acquired pricing information from the SSAC Dealer Sales Agreement that Defendant Trigiani's associate surreptitiously obtained from Mr. Taylor, which it used to undercut SSAC when it solicited SSAC's dealers.  Morgan Aff. ¶ 13. These actions clearly were in violation of the DPI Noncompete.

2. **The evidence will establish DPI breached its implied-in-fact contract with SSAC by failing to give reasonable notice of its termination of that contract.**

In a detailed analysis provided in *Primarque Prod. Co. v. Williams W. & Witts Prod. Co.*, the U.S. Court of Appeals for the First Circuit recently discussed the validity and enforceability of implied-in-fact contracts. Said the Court:

> [T]he Massachusetts UCC defines a "contract" as "the total legal obligation that results from the parties' agreement," Mass. Gen. Laws ch. 106, § 1-201(12), and further defines "agreement" as "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance [or] course of dealing," *id.* § 1-201(3) (emphasis added); see also Restatement (Second) of Contracts § 4 cmt. a (1981) (reflecting that this definition of "agreement" is the means by which the Uniform Commercial Code recognizes implied-in-fact contracts). Similarly, the Massachusetts UCC states that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Mass. Gen. Laws ch. 106, § 2-204(1) (emphasis added); *see also id.* § 2-204, Official Comment (noting Massachusetts UCC's "basic policy of recognizing any manner of expression of agreement, oral, written or otherwise"(emphasis added)).

988 F.3d 26, 35 (1st Cir. 2021) (all emphasis added by the Court); *see also, e.g., LiDonni, Inc. v. Hart*, 355 Mass. 580, 583 (1969).

The evidence will establish that, like the supplier and distributor in *Primarque*, DPI and SSAC had an implied-in-fact contract that they created by their course of dealing and as shown by their conduct. SSAC committed to distribute, market, and provide customer service for the HBS products exclusively in exchange for DPI's promise to sell the product primarily to SSAC. SSAC's 65% discount, and the net-30 payment terms, were the terms on which SSAC obtained, and DPI supplied, the HBS materials virtually throughout the parties' entire relationship. That the parties agreed that SSAC was to be the primary supplier of HBS products is evidenced not only by the attached affidavit testimony but by the HBS User Manual produced and supplied to hundreds of customers by DPI, which was labelled **SonicSolutions Algae Control** and required customers to contact SSAC for customer service and to resolve warranty issues. *See* Ex. 2 at 1,

39, 40. The existence of such an agreement is further established by DPI's representation, made in February 2021, that SSAC was its "exclusive dealer."  *See* Ex. 3.

The contract between the parties did not have a termination provision.  In the absence of such a term, the standard UCC term requiring that "reasonable notification" be provided in the event one party wishes to terminate the contract can be imputed into the contract. *See* Mass. UCC § 2–309(3) ("Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party…."); *see also Primarque Products Co.*, 988 F.3d at 34 (applying Mass. UCC § 2–309(3) to an implied-in-fact contract).

"Reasonable notification" is notification that "will give the other party reasonable time to seek a substitute arrangement." *See* Mass. UCC § 2–309(3), cmt. 8. This standard is based upon the "application of principles of good faith and sound commercial practice." *Id.*; *see also Teitelbaum v. Hallmark Cards, Inc.*, 25 Mass. App. Ct. 555, 560 (1988) ("The reasonableness of notice of termination in agreements falling within § 2–309 is measured in terms of the ability of the party affected by the termination to obtain a substitute arrangement."); *Primarque*, 988 F.3d at 38 (same).  "Adequacy of notice is generally coextensive with the amount of harm that can be proved by the party who has incurred the loss of a supplier." *Teitelbaum*, 25 Mass. App. Ct. at 561.  Notice is adequate if, in the time provided, the distributor is able to build a full inventory of products from a substitute supplier. *Id.*; *see also Primarque Prod. Co. v. Williams W. & Witts Prod. Co.*, 988 F.3d 26, 38 (1st Cir. 2021)*; Healthco Intern., Inc. v. A-dec, Inc.*, CIV. A. No 87–0235–S, 1989 WL 104064, at *9 (D. Mass. Apr. 17, 1989) (90 days' notice reasonable when purchaser received less than 25% of its supply from distributor who terminated the contract).

DPI indisputably breached the contractual requirement to provide "reasonable notification" when it provided *no* notice before it terminated SSAC's supply of products, and effectively terminated the parties implied-in-fact contract before providing any opportunity whatsoever for SSAC to make substitute arrangements. SSAC receives 100% of its product supply from DPI. Taylor Aff. ¶ 5.  To survive, SSAC needs a supply of HBS products from DPI for a reasonable period of time so that it can provide product to its customers during the current algae season while securing a substitute supply. There are few alternative producers of such products, all of which have been competitors of SSAC for years. Taylor Aff. ¶ 7.  To survive, SSAC will need to develop its own manufacturing capability, which it can do; but it will need reasonable time. Taylor Aff. ¶ 8.  Reasonable time, and reasonable notification in this case, is at least six months. *See id.*

**3. By refusing to honor purchase orders SSAC already placed, by maliciously refusing to supply product without prior notice during the height of algae season, by spreading defamatory statements about SSAC, and by employing confidential information in violation of the DPI Noncompete to take SSAC's customers for itself, DPI has committed tortious interference.**

Under Massachusetts law, the tort of interference in advantageous business relations occurs when (1) a plaintiff has an advantageous relationship with a third party, (2) of which a defendant knowingly induces a breaking, (3) using interference that is improper in motive or means, and (4) resulting in harm to the plaintiff.  *Hamann v. Carpenter*, 937 F.3d 86, 93 (1st Cir. 2019) (citing *Blackstone v. Cashman*, 860 N.E.2d 7, 1213 (Mass. 2007)). The evidence discussed above will clearly establish that SSAC had advantageous relationships with its customers, which it and its predecessors had built over decades, in addition to a most significant prospective investor relationship; that Defendants knowingly and purposefully induced a breaking of those relationships; that, by inducing such breakage through, among other things, surreptitiously using

confidential information in breach of the DPI Noncompete, defaming SSAC, and terminating its implied-in-fact contract without reasonable notice, Defendants interfered in a manner that was improper in both motive and means; and that, as discussed further below, the resulting harm to Plaintiffs is severe and irreparable. *Compare Primarque Prod. Co. v. Williams W. & Witts Prod. Co.*, 988 F.3d 26, 39-40 (1st Cir. 2021) *(*affirming finding that defendant intentionally and improperly interfered with plaintiff's advantageous business relations with its drop ship customers by abruptly terminating the parties' distributorship agreement without reasonable notice and which left plaintiff no time to secure another supplier to fulfill its obligations to Customers).

Plaintiffs also will be able to show that DPI interfered with SSAC's contractual relations. *See O'Donnell v. Boggs*, 611 F.3d 50, 54 (1st Cir. 2010). DPI knew that SSAC had a contractual relationship with its authorized dealers, and that such terms included a two-year noncompete. *See* Doc. 1-4 (Dealer Sales Agreement). Yet, before and immediately after refusing to supply SSAC with its sole line of products, DPI contacted SSAC's dealers and attempted to induce breach of this contractual obligation by offering them lower prices. *See, e.g.,* Morgan Aff. ¶¶ 12-13; Hutchinson Aff. ¶¶ 8-9 and Exhibits A and B thereto. The fact that DPI was apparently willing to forego its share of profit from SSAC's purchases for its clients in order to fatally undercut SSAC indicates that their intention was not just economic competition, but the total destruction of the primary distributor of DPI's HBS products. This sort of spiteful and malignant purpose, however related to a corporate interest, is improper. *See Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 43 (1st Cir. 2011). *See also Hamann v. Carpenter*, 937 F.3d 86, 91 (1st Cir. 2019) (recognizing imposing economic pressure on contracted party as improper means).

That DPI's actions have caused SSAC economic harm as a result of their tortious interference is clear. SSAC has not received an investment from AlgaeSonix as a result of DPI's actions. SSAC has not been able to fulfill its customers purchase orders as a result of DPI's actions. SSAC's relations with its customers—built on years of marketing and proposals and customer service—are now tenuous at best. SSAC now cannot solicit orders that it cannot fulfill on a timeline it cannot control. But much more importantly, Defendants' actions are on the verge of causing Plaintiffs' utter destruction.

**B.** **The Harm SSAC is Suffering and Will Continue to Suffer Is Irreparable.**

As a result of DPI's total and abrupt refusal to sell any HBS products to SSAC, SSAC has lost access to its only line of products.  The loss of a product line, even without more, is an irreparable injury as prospective customers must turn to a competitor who does not labor under the same handicap.  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (collecting cases).  In *Ross-Simons*, the loss of a single product line, which generated less than 1% of the plaintiff's total annual sales, led to an incalculable loss of goodwill and a likelihood that customers "may choose not to [conduct business with Plaintiff], enlisting instead with a competitor who offers the full spectrum of desired products."  *Id.* at 19-20.  In such circumstances, a preliminary injunction compelling the supplier to continue selling products to the plaintiff is appropriate.  *Id.* at 13-15 (affirming district court's grant of such a preliminary injunction).

In this case, the injury is much more than the loss of a customer. It is even more than the significant reputational damage that results from Plaintiffs' inability to follow up with their customers on outstanding warranty issues, to timely fulfill orders, or to provide the level of service that Plaintiffs' customers and dealers have come to expect from it.  *See* Assael Aff. ¶ 5.

Well beyond that, without an injunction from this Court requiring DPI to continue supplying it with HBS products, SSAC will almost certainly cease to exist. Taylor Aff. ¶ 12.

SSAC does not have sufficient financial reserves to endure an entire algae season without a supply of products to sell. Ver. Compl. ¶ 122. As of June 16, 2021, SSAC's management estimated that it has cash on hand and expected accounts receivable receipts to support the business for less than 30 days.  Taylor Aff. ¶ 11. Absent immediate relief from this Court, SSAC will almost certainly be forced out of business.  Ver. Compl. ¶ 123. An injunction to prevent such a result is clearly appropriate. *See, e.g., Engine Specialties, Inc. v. Bombardier Ltd.*, 454 F.2d 527, 531 (1st Cir. 1972) ("An injunction is proper to prevent the threatened extinction of a business, and to prevent disruption of a company's relationship with its dealers."). Under such circumstances, injunctive relief is the appropriate—and essential—remedy.

C. **DPI Will Not Be Harmed By Requiring It To Ethically Carry On Business With Plaintiffs Pursuant To Business Terms Established By Their Prior Course of Dealing.**

If this court enjoins DPI's tortious behavior and orders it to continue to supply its HBS products to SSAC at the parties' business terms established prior to Defendants' wrongful conduct, DPI will not suffer any significant harm. In fact, DPI will benefit, financially and reputationally, from SSAC's sales of the HBS products, in the same manner that it has for years. If SSAC is able to supply its consumers with DPI's products, DPI stands to receive more than $900,000 in revenue during just this season. Ver. Compl. ¶ 111.  It is true that DPI could receive more profit on these sales if it were to succeed, through contractual breach and tortious interference, in taking SSAC's clients for itself. Such a potential "harm," however, is not significant when weighed against the potential for total destruction of Plaintiffs' business.

**D.**   **Public Interest Favors Issuance of the TRO/Injunction.**

The public interest in enforcing valid contracts and ensuring that parties adhere to their

contractual obligations is evident. *See Get in Shape Franchise, Inc. v. TFL Fishers, LLC*, 167 F.

Supp. 3d 173, 200 (D. Mass. 2016) ("[T]he public has a legitimate interest in ensuring that

legally enforceable contracts are enforced."). The public also has an interest in "guaranteeing

companies protection for their confidential or proprietary information." *EMC Corp. v. Arturi*,

No. 10-40053-FDS, 2010 WL 5187764, at *7 (D. Mass. Dec. 15, 2010), *aff'd and remanded*, 655

F.3d 75 (1st Cir. 2011). The public's interest in protecting business is especially strong where a

preliminary injunction will serve to prevent a small company from going out of business. *See*

*Rohm and Haas Electronic Materials, LLC v. Electronic Circuits Supplies, Inc.*, 759 F. Supp. 2d

110, 128 (D. Mass. 2010) ("[I]t is not in the public interest to put a small company out of

business."). Defendants had contractual, statutory, and common law obligations under

Massachusetts law to give reasonable notice prior to termination, to not misuse SSAC's

confidential information, to act ethically, and to not improperly interfere in Plaintiffs' business,

and where it did not adhere to those obligations, the public interest is best served by requiring

that they do so.

## III.   CONCLUSION

WHEREFORE, due to the ongoing, severe, and irreparable injury to Plaintiffs caused by

Defendants' unfair acts and practices targeted to put Plaintiffs out of business, including but not

limited to their misappropriation of Plaintiffs' customer information, their interference with

Plaintiffs' business and contractual relationships, their failure to provide reasonable notice before

terminating their implied-in-fact contract with SSAC, and their breach of the DPI Noncompete,

Plaintiffs respectfully request that this Honorable Court order that Defendants, their agents,

servants, and employees, and all persons acting under their permission and authority, be

immediately enjoined and restrained for at least the remainder of 2021 from:

    a.   refusing or otherwise failing to timely fulfill orders for HBS products from SSAC or its affiliate entities consistent with the practices among the parties as of January 1, 2020;

    b.   stating or implying to any SSAC customer to which it has provided HBS products that SSAC is not to be involved in the warranty process for such products or refusing to cooperate with SSAC in fulfilling any such warranty in substantial compliance with the warranty service process employed by DPI and SSAC as of January 1, 2020;

    c.   stating or implying to any party that SSAC or its affiliated entities are not authorized to sell, service, or otherwise fulfill orders for any HBS product;

    d.   contacting any SSAC customer for any purpose related to HBS products or otherwise except as authorized in writing by SSAC; or

    e.   using any SSAC customer or pricing information for any purpose whatsoever except as SSAC may authorize in writing.

RESPECTFULLY SUBMITTED

PLAINTIFFS,
SONICSOLUTIONS ALGAE CONTROL, LLC,
SONIC SOLUTIONS, LLC and
ALGAECONTROL.US LLC

By Their Attorneys,

  /s/ James C. Duda
James C. Duda, Esq. (BBO # 551207)
Lauren C. Ostberg, Esq. (BBO # 696883)
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115-5507
Tel. (413) 272-6286
jduda@bulkley.com
lostberg@bulkley.com

Dated: June 18, 2021

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF"). An electronic copy of this document will be sent to non-registered participants via electronic mail on the date of its filing, and paper copies will follow on the next business day.

/s/ <i>Lauren C. Ostberg</i>

3478106