UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | | |
|---|---|---|
| SONICSOLUTIONS ALGAE CONTROL, LLC, SONIC SOLUTIONS, LLC, and ALGAECONTROL.US LLC, | ) ) ) | Civil Action No. 3:21-cv-30068-MGM |
| Plaintiffs, | ) | MEMORANDUM IN SUPPORT |
| v. | ) | OF MOTION FOR |
| | ) | RECONSIDERATION OF |
| DIVERSIFIED POWER INTERNATIONAL, | ) | ORDER REGARDING |
| LLC, and ANTONIO TRIGIANI, | ) | PLAINTIFFS' MOTION FOR |
| Defendants. | ) | PRELIMINARY INJUNCTION |

Plaintiffs SonicSolutions Algae Control, LLC ("SSAC"), Sonic Solutions, LLC ("Sonic Solutions") and AlgaeControl.US LLC ("ACUS") (together, "Plaintiffs") hereby move the Court to reconsider its September 9, 2021 Order Regarding Plaintiffs' Motions for Preliminary Injunction (the "Order"). As discussed below, the Order was based upon material legal errors and misapprehensions of facts, and the evidentiary record more than met Plaintiffs' burden of showing both a likelihood of success and the existence of irreparable harm. The Court should therefore reconsider its ruling, allow Defendants to present their own testimony on any material facts that they can credibly contest, and then grant Plaintiffs relief as appropriate.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs first sought injunctive relief, in the form of a temporary restraining order and/or preliminary injunction, when they filed their Complaint on June 6, 2021, and then moved for immediate relief in a motion dated June 18, 2021. Following a frenzy of solicitations by Defendants to SSAC's customers and dealers, Plaintiffs renewed their motion on July 7, 2021. In support of their motions, Plaintiffs have argued the merits of their claims supported by numerous exhibits and affidavits from several witnesses presenting key facts, most of which were not contested, including, *inter alia,* Defendants' termination without notice of their sale to SSAC of

the only product SSAC had ever sold; their direct contact and solicitation of SSAC's clients using customer information previously provided by Plaintiffs; and their prevention of SSAC from fulfilling its warranty obligations to its customers. The evidentiary basis of Defendants' response consisted entirely of affidavits of Defendant Antonio Trigiani, at least one of which the Court relied upon in reaching its ruling. *See* Order at 2, 10.

After considering and denying several motions to dismiss filed by Defendants, the Court ordered the parties to present evidence at a remote hearing "as to certain factual disputes and credibility issues pertinent to the motions' resolution." Dkt. 57. The Court indicated that the parties should, "[a]t a minimum," provide testimony from Defendant Trigiani and Charles Morgan, a third party formerly employed by DPI.[1] "Specifically," the Court requested evidence regarding six discrete topics, at least one of which expressly arose from Mr. Trigiani's affidavits:

(1) What, if any, contracts with third parties for Hydro Bioscience products did Plaintiffs fulfill using products from Algaesonix, LLC's inventory?;

(2) What are the circumstances surrounding Charles Morgan's February 4, 2021 letter to Obras Sanitarias del Estrado (Dkt. No. 7-3), and what is the basis for Defendant Trigiani's characterization of the letter as "secretive and fraudulent" (Dkt. No. 26-1, 9)?;

(3) How, why, and in what format (blank or completed) did Mr. Morgan obtain a copy of a dealer agreement for SonicSolutions AlgaeControl, LLC?

(4) What is the factual basis for Plaintiffs' statement that Defendants committed a "breach of DPI's distributorship agreement with SSAC" in the Verified Complaint at 82?;

(5) Do Plaintiffs contend that Sonic Solutions AlgaeControl, LLC is the legal successor to Sonic Solutions, LLC?; and

(6) Does reference to "DPI's providing components for products offered by Sonic" in the May 8, 2012 Agreement (Dkt. No. 7-1) refer to Defendants' XSun solar power products, Hydro Bioscience products, or something else?

Dkt. 57. While the Court stated that it would allow other evidence, it did not suggest that, for purposes of Plaintiffs' motions, it needed further evidence beyond that specifically requested or

---

[1] In light of the Court's Order, Plaintiffs reasonably understood that they would be provided the opportunity to cross-examine Mr. Trigiani.

which was already before it in the form of affidavits and exhibits supporting previous motions.

At the evidentiary hearing, Plaintiffs' witnesses, including Mr. Morgan, addressed at length the specific questions posed by the Court and were subjected to extensive cross-examination. *See* Ex. 1 (Transcript of 8/31/21 hearing) and Ex. 2 (Transcript of 9/1/21 continuation of hearing), attached. The Court did not require Defendants to put forth Mr. Trigiani, and he therefore was not subject to cross-examination. Instead, the Court suspended the hearing at the end of Plaintiff's presentation. At that point, in addition to the testimony of Plaintiffs' witnesses, the evidence before the Court included numerous affidavits, various exhibits, and Plaintiffs' verified Complaint.

The Order (Dkt. 64) indicated that it was prepared after the Court's consideration of the testimony of Mr. Morgan, Ms. Assael, and Mr. Taylor and documentary evidence, along with the parties' briefs, affidavits, and exhibits supporting their positions for and against previously submitted motions. *See* Order at 1.[2]  The reasoning presented in the Order in support of its denial of Plaintiffs motions, however, failed to address undisputed evidence before the Court that was central to the several of Plaintiffs' claims and their plea for injunctive

---

[2] When considering a motion for preliminary injunction, in addition to hearing testimony, the Court may "accept as true Plaintiff's well-pleaded allegations and uncontroverted affidavits.'" *Rohm & Haas Elec. Materials, LLC v. Elec. Circuits*, 759 F. Supp. 2d 110, 114, n.2 (D. Mass. 2010). *See also Elrod v. Burns*, 427 U.S. 347, 350, n.1 (1976) ("well-pleaded allegations of respondents' complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true" for purposes of Court's review). The "dispositive question is … whether, weighing all attendant factors, including need for expedition, evidence is appropriate given character and objectives of injunctive proceeding." *See Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986). Of particular significance is whether the opposing party had the opportunity to cross-examine each witness that provided evidence before the Court. *See id.*; *see also Ross-Whitney Corp. v. Smith Kline & French Laboratories,* 207 F.2d 190, 198 (9th Cir. 1953) (requiring full hearing on merits would "defeat one of the purposes of a preliminary injunction which is to give speedy relief from irreparable injury."). There is no question that fair consideration of all evidence before the Court for purposes of Plaintiffs' motion for preliminary injunction, including affidavits and previously submitted exhibits, was appropriate. Order at 1 (recognizing submissions to be considered).

relief. The Court also relied in substantial part upon misapprehended testimony and other documents before the Court. The only affidavit to which the Order cited was that submitted by Mr. Trigiani, whom -- according to the Court's scheduling order for the hearing -- Defendants were expected to put forward for examination, but did not.

## II.    <u>STANDARD OF REVIEW</u>

A motion for reconsideration may be granted when the movant shows a manifest error of law or provides evidence that the court "has patently misunderstood a party … or has made an error not of reasoning but apprehension." *Ruiz Rivera v. Pfizer*, 521 F. 3d 76, 82-83 (1st Cir. 2008) (citations omitted). It is also appropriate if the Court abuses its discretion by ignoring a material factor deserving significant weight, relying upon an improper factor, or making a serious mistake in weighing such factor. *See Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir. 1988) ("*Procter Gamble*").

Motions for reconsideration on a preliminary injunction decision give the Court an opportunity to exercise its inherent discretion to alter an interlocutory order. *See Farr Mann & Co. v. M/V Rozita*, 903 F.2d 87l,874-75 (1st Cir. 1990). Such motions also toll the time in which the aggrieved party may appeal such decision to the Court of Appeals. *See, e.g., AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346, 351 (D. Mass. 2012), *aff'd*, 711 F.3d 248 (1st Cir. 2013); *see also Feinstein v. Moses*, 951 F.2d 16, 18–19 (1st Cir. 1991) (citations omitted).

### III.   <u>ARGUMENT</u>

**The Court Should Reconsider All Material Evidence,
Correctly Construe Testimony and Argument Presented to It,
Correct Key Errors of Law, and Reopen the Hearing on Plaintiffs' Motion.**

This Court should exercise its ongoing discretion and, for at least three key reasons, reconsider its ruling denying Plaintiff's motion for a preliminary injunction:

- The Court failed to consider evidence and arguments that were before it.

- The Court misconstrued testimony and arguments that were before it.

- The Court made errors of law concerning the doctrine of implied-in-fact contract, the effect of non-assignment clauses under Massachusetts law, and the nature of irreparable harm.

Specifically, because undisputed evidence of course of dealing between the parties demonstrates the existence of an implied-in-fact agreement between SSAC and DPI, the Court should reconsider its determination that Plaintiffs were not likely to succeed on their claim for breach of this contract. Similarly, because the evidentiary record provides undisputed, persuasive evidence, not considered by the Court in its Order, that Defendants relied on Plaintiff-supplied customer information to directly solicit Plaintiffs' customers, and because such Order misstates testimony of a critical witness on this issue, the Court should reconsider its determination that Plaintiffs were not likely to succeed on the merits of their tortious interference claims. In addition, because the 2012 Agreement, as a matter of law, was properly assigned and in effect as of April 2021, and because the Order misapprehends the testimony of an essential witness on this issue, the Court should reconsider its determination that Plaintiffs were not likely to succeed on the merits of their claim for breach of that agreement. Finally, the Court should reconsider its analysis of Plaintiffs likelihood of success on their claims under Mass. Gen. L. ch. 93A because that analysis was substantially based upon the foregoing legal and factual errors and was made without consideration of key documents in the evidentiary record.

**A.  The Evidence Before the Court Establishes that Plaintiffs Are Likely to Succeed on the Merits of Their Asserted Claims.**

   **1.  The evidence establishes that Defendants likely breached an implied-in-fact contract with Plaintiff SSAC.**

   ***a.  A party's lack of explanation for the absence of a written contract and a party's dealings with other entities are irrelevant to whether the parties at issue, through their conduct and course of dealing, created an implied-in-fact contract.***

This Court placed an impermissible and virtually impossible burden upon Plaintiffs by ruling that they had not presented sufficient evidence of an implied-in-fact contract because, in substantial part, Mr. Taylor "did not give a persuasive reason why SSAC would not have memorialized the terms of their implied distributorship contract with DPI when SSAC's sole business was to market and sell DPI's HBS products." Order at 8. The absence of such an explanation has no relevance under the law of Massachusetts, and the Court's reliance on that factor was material error. The Court compounded its error by also relying upon its misperception that "Mr. Taylor testified that SSAC usually executed written contracts when conducting other business." Order at 8. What a party does in other contractual situations is of no relevance to whether the parties at issue created an implied-in-fact contract between them by *their* conduct.

Massachusetts law recognizes that parties may create a contract, in the absence of a written or oral agreement, on the basis of their course of dealing. Order at 7. As the Court of Appeals for this Circuit has stated, in the Commonwealth, an enforceable agreement is "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance or course of dealing." Order at 7 (citing *Primarque Prods. Co., Inc. v. Williams West & Wilts Prods. Co.,* 988 F.3d 26, 34-35 (1st Cir. 2021) ("*Primarque*") (quoting Mass. Gen. L. ch. 106 § 1-201(3))[3] (emphasis added by the Court of

---

[3] The Order mistakenly suggests that the Court of Appeals cited to Section 1-201(12) for this proposition. *Compare* Order at 7 with *Primarque,* 988 F.3d at 35.

Appeals but omitted by this Court). The Court of Appeals has further instructed that, in Massachusetts, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, <u>including conduct</u> by both parties which recognizes the existence of such a contract." *Primarque,* 988 F.3d at 34-35 (1st Cir. 2021) (quoting Mass. Gen. L. ch. 106 § 1-204(1)) (emphasis added by the Court of Appeals). It has further emphasized the UCC's "basic policy of recognizing any manner of expression of agreement, oral, written <u>or otherwise</u>." *Primarque,* 988 F.3d at 35 (quoting Mass. Gen. L. ch. 106, §2-204, Official Comment) (emphasis added by Court of Appeals). Subjective intent regarding the alternative of a written or oral agreement has not been indicated to be a relevant factor.

The essence of an implied-in-fact contract is that it is *not* memorialized or otherwise expressed in writing or orally; that is why it is "implied-in-fact." There is, so far as we know, no suggestion in the Massachusetts UCC, in the opinions of the courts of this Circuit, or in any other applicable authority suggesting that the presence or absence of an explanation of why an implied-in-fact agreement was not memorialized in writing has any relevance whatsoever to the question of whether the parties, *through their conduct*, had, in fact, established a contract between them. The Massachusetts Uniform Commercial Code exists, in large part, to relieve merchants from the burden of memorializing the terms of repeat transactions. Suggesting that articulation of a reason for not executing a written or oral contract is a material factor in recognizing an implied-in-fact contract would effectively make such a contract virtually impossible, unless the "reason" is, as it is here, that the parties, through their mutual assurances and course of dealing over time and their mutual obligations to act in good faith, already had an agreement as to the fundamental terms of their deal upon which they reasonably relied.

Under virtually identical material circumstances to those before this Court, the *Primarque* Court gave no consideration to the ability or inability of the party before it – who, like SSAC,

was the largest purchaser and distributor of defendants' products – to explain the absence of a written agreement as having any relevance to its analysis. *Primarque*, 988 F.3d at 36. In that case, the supplier had actually "resisted the overtures" of the distributor when the distributor requested that the parties enter into an express agreement. *See id.* at 37. Certainly, a party's express refusal to enter into a written agreement cannot be more persuasive of the existence of an implied contract than the parties' behaving according to an accepted course of dealings between them over a period of time without questioning the need for a written contract.

Relatedly, the Court also erroneously relied upon its misperception that "Mr. Taylor testified that SSAC usually executed written contracts when conducting other business." Order at 8. Mr. Taylor did *not* so testify. Rather, Mr. Taylor simply answered in the affirmative when asked whether a company needed to sign a dealer agreement to be an SSAC dealer. *See* Ex. 1 (Transcript) at 132. Mr. Taylor did not otherwise testify to SSAC contracting practices in other business situations. In any event, the Court did not indicate the relevance of SSAC's other business practices to the issue of whether DPI and SSAC had, by *their* conduct, established a contractual relationship between themselves.

### b. The relevant evidence that is before the Court establishes that an implied-in-fact contract between DPI and SSAC existed and Defendants breached it.

By focusing on the absence of a "persuasive explanation" for a lack of a writing and SSAC's contractual dealings with other parties, the Court placed an impermissible burden on Plaintiffs to make a showing that says nothing about the conduct of the parties, while mostly ignoring the substantial course of dealing evidence that was before it that establishes such a contract. As summarized below, the essential terms of that contract were that SSAC (i) devote all of its efforts to marketing and selling DPI's ultrasonic algae control products, (ii) utilize and further grow its existing customer base, developed by and assigned to SSAC by its predecessors-

in-interest, solely to market those DPI products, and (iii) act as the primary contact for warranty and other services provided in connection with DPI products. In return, DPI was to (i) provide its ultrasonic products to SSAC at a commercially reasonable discount, (ii) not compete with SSAC, and (iii) cooperate with SSAC to complete warranty and other services for SSAC's customers. Underlying both parties' commitments was their mutual obligation to act in good faith. The ongoing discount and related terms for sale and purchase of the DPI products were, as in any other dealer/distributor agreement, subject to market factors, ongoing discussons, and the parties' obligation of good faith. The relevant evidence demonstrating the existence of this agreement includes:

- A version of a press release, revised and approved by DPI's legal counsel and Defendant Trigiani, that named SSAC as DPI's "exclusive distributor," *see* Ex. 1 (Transcript) at 57:7-21 & Pls' Exh. 5;

- A press release sent to all of SSAC's distributors and customers, put on the SSAC's website, and distributed to various media outlets announcing the partnership of Sonic Solutions and ACUS for the distribution of DPI products, *see* Ex. 1 (Transcript) at 54-55 & Pls' Exh. 4;

- Uncontradicted testimony that Defendant Trigiani expressly committed DPI to provide products to SSAC at a discounted price, *see* Ex. 1 (Transcript) at 63:15-64:3, 114:20-24;

- Uncontradicted testimony and evidence that DPI did, in fact, provide its products to SSAC at a discounted price, *see* Ex. 1 (Transcript) at 63:24-64:3; *see also* Pl's Exh. 7 (Trigiani correspondence with discount levels visible); Dkt. 8-1 (purchase order reflecting discount off MSRP); Dkt. 26-1 ¶42 (Trigiani acknowledges negotiation between DPI and SSAC concerning proposed price increases)

- Uncontradicted testimony that Defendant Trigiani committed Defendants not to compete with SSAC, *see* Ex. 1 (Transcript) at 63:23-64:22, *id.* at 114:20-24 & Pls' Exh. 7;

- Uncontradicted testimony that SSAC expressly committed to DPI to sell only DPI products, *see* Ex. 1 (Transcript) at 65:4-15; *id.* at 114:10-16;

- Uncontroverted evidence that SSAC did, in fact, sell only DPI products, *see, e.g.*, Ex. 1 (Transcript) at 53:21-25;

- Uncontradicted testimony that SSAC expressly committed to DPI to contribute, and did contribute, its Sonic Solutions and ACUS customer base, developed by its predecessors since 2003, to market only DPI products, *see* Ex. 1 (Transcript) at 58, 114;

- Defendants' admissions that Sonic Solutions, ACUS, and SSAC were, at all relevant times, responsible for more than 80% of DPI's HBS sales, *see* Dkt. 61 (Answer) ¶ 43;

- Uncontradicted testimony and documentary evidence that the User Manual that DPI distributed with DPI products was branded with the SSAC name, *see* Answer ¶ 33 ("admitted that the Manual was included with DPI's HBS products that were shipped to customers of SSAC"); Ex. 1 (Transcript) at 63:4-13; Dkt. 1-4 (manual).

- DPI's User Manual that directs customers to contact SSAC, and only SSAC, for customer warranty and other service issues involving DPI's products, Dkt. 1-4 at 40, 41;

- Uncontested testimony that SSAC did, in fact, provide warranty services for DPI products, *see* Ex. 1 (Transcript) at 62-63;

- Uncontested testimony and documentary evidence that Defendant Trigiani encouraged and directed SSAC to develop marketing materials, including postcard mailings, online advertising, and trade shows, for DPI's products using SSAC's brand, *see* Ex. 1 (Transcript) at 58, 59-60 & Pls' Exh. 6;

- Uncontested testimony that the parties did, in fact, exploit the Sonic Solutions brand to market DPI products, *see* Ex. 1 (Transcript) at 60-61;

- Mr. Trigiani's clearly expressed expectation that SSAC complete marketing tasks for DPI, *see* Pls' Exh. 6;

- Uncontested testimony that SSAC's Vice President of Sales and Marketing, Devon Assael, wrote the press release announcing Defendant Trigiani's patent on the products marketed by DPI and sold by SSAC, *see* Ex. 1 (Transcript) at 56 & Pls' Exh. 5;

- Uncontested testimony that DPI and SSAC cooperated at trade shows to market DPI products under the Sonic Solutions brand, *see* Ex. 1 (Transcript) at 61-62;

- Communications in which Mr. Trigiani explicitly acknowledged the prior pricing, payment, and shipment terms on which the parties had operated, *see* Dkt. 11-1 at 2; and

- Admissions, by all parties, that DPI manufactured the only products Sonic Solutions, and later SSAC, sold from at least 2018 on*, see, e.g.,* Compl. ¶ 22, *accord* Counterclaim ¶ 23.

Such substantial evidence, properly considered and weighed, is more than sufficient to

establish the existence of an implied-in-fact contract.[4]

---

[4] In *Primarque*, a substantially smaller amount of course of dealing evidence was sufficient to show an implied in fact contract when there was a showing that: (i) the supplier had continuously supplied plaintiff with products over a period of time; (ii) the plaintiff was allowed to resell its products under the supplier's label; (iii) the parties had a close working relationship, which involved sharing potentially sensitive business information concerning, *inter alia,* drop ship customers; and (iv) the supplier previously referred to plaintiff, which distributed the majority of the products it manufactured, as its "distributor." 988 F.3d at 37. Here, record evidence establishes that : (i) DPI continuously supplied SSAC and its predecessors with HBS products since it began manufacturing them, Dkt. 61, ¶¶ 22, 23, 28; (ii) SSAC was listed as the customer service contact for HBS products, Dkt. 1-4 at 41; (iii) the parties had a close working relationship, Ex. 1 (Transcript) at 61:18-62:13, which involved sharing the addresses of drop ship

**2. The evidence before the Court establishes that Plaintiffs are likely to prove that Defendants tortiously interfered with SSAC's advantageous business relationships and contracts.**

In ruling on the likelihood of success with respect to Plaintiffs' three claims for tortious interference, the Court, in its Order, does not question the sufficiency of evidence of SSAC's relevant contracts and its business relationships that contemplated economic benefit, Defendants' knowledge of those contracts and relationships, or that SSAC suffered damage due to Defendants' actions. Rather, the Court concluded that evidence before it is insufficient to show that Defendants "intentionally and improperly" interfered with those relationships. Order at 5. In this context, the Court made at least two substantial errors.

First, the Court apparently misunderstood that Plaintiffs, in their Complaint, alleged that DPI's intentional and improper interference consisted only of Defendants' decision to "abruptly terminat[e] its supply of HBS products to Plaintiffs without providing reasonable notice." *See* Order at 5. In doing so, the Court failed to acknowledge that Plaintiffs also alleged in their Complaint, and presented substantial evidence in support thereof, that "DPI intentionally induced the breaking of [Plaintiffs' advantageous business] relationships by contacting Plaintiffs' dealers and customers and offering to sell HBS products to them directly." Compl., ¶128. Plaintiffs' Renewed Motion for Preliminary Injunction likewise argued that and referenced evidence in such motion that clearly establishes, *inter alia,* that Defendants knowingly and purposefully are in the process of inducing a breaking of SSAC's customer relationships, relying, in whole or in part, on "drop ship" customer information that Sonic Solutions provided to Defendants. *See* Doc. 34 at 4.

The failure to recognize this key allegation perhaps led to the second and most substantial error of the Court on this issue in its Order; that is, its consideration of only the testimony of

_____

customers, *see, e.g.,* Answer ¶ 93; and (iv) DPI recognized SSAC as its distributor, *see, e.g.,* Pls' Exh. 4.

DPI's former employee, Charles Morgan, as evidence of Defendants' intentional and improper

means of interfering in Plaintiffs' business relations. *See* Order at 5-6; *see also Procter Gamble,*

864 F.2d 927, 929 (abuse of discretion occurs "when a material factor deserving significant

weight is ignored") (citations omitted). The Court thus failed to consider evidence that:

(i)    Defendants encouraged and facilitated SSAC to become a sole distributor of
       DPI's products, *see, e.g.,* Ex. 1 (Transcript) at 57:7-21, 58:9-18, 111:9-24*;*

(ii)   through that relationship, Defendants gained access to SSAC's valuable customer
       information, *see, e.g.,* Ex. 1 (Transcript) at 84:8-14;

(iii)  the information was developed by SSAC and its predecessors over an 18 year
       period, *see, e.g.,* Ex. 1 (Transcript) at 58:4-6; 110:13-16, 112:3-6;

(iv)   Defendants intentionally took specific steps to prevent SSAC from continuing its
       business relationships with those customers, including termination of its supply of
       product and refusing to cooperate in warranty services, *see, e.g.,* Ex. 1
       (Transcript) at 115:12-18, 123:11-16, 126:17-21, Dkt. 8 ¶ 8;

(v)    Defendants then used the customer information acquired from SSAC to solicit
       those customers directly and usurp them from SSAC, *see, e.g.,* Ex. 1 (Transcript)
       at 115:13-18, 123:18-21, Dkt. 8 (Assael Aff.) ¶¶ 6-9; Dkts. 8-1, 8-2, 8-3, and 8-4
       (correspondence from Defendant Trigiani soliciting SSAC dealers), including on
       orders placed between April 19, 2021 and April 26, 2021, *see, e.g.,* Dkt. 7 at 8-9
       (facts concerning circumstances and effect of DPI's refusal to honor already
       placed purchase orders); Dkt. 8 at ¶ 14 (Aquarion order lost to DPI).

Certainly a jury would most likely, and perhaps would necessarily, see such actions to reflect the

essence of intentional and improper means and motive[5] in interfering with SSAC's advantageous

business relations.

As the Court of Appeals recently made clear, a party also may improperly interfere with

another party's advantageous relationship with drop ship customers "by abruptly terminating the

parties' [implied-in-fact] distributorship agreement without reasonable notice, [leaving the party]

no time to secure another supplier to fulfill its obligations to [the Drop Ship] Customers."

---

[5] The Court also failed to weigh evidence that Defendants offered SSAC's dealers prices lower
than those SSAC offered, suggesting that Defendants' usurpation of such customers was based
on an improper motive of animus against SSAC, rather than a profit motive.  Dkt. 10 ¶ 9; *see*
Dkt. 7 at 16 (argument concerning same).

*Primarque Products Co., Inc. v. Williams West & Witts Products Co.*, 988 F.3d 26, 39-40 (1st Cir. 2021) (quoting 368 F. Supp. 3d 192, 199 (D. Mass. 2019)). As discussed in the preceding section, there is substantial uncontested evidence that the parties, like the parties in *Primarque*, had an implied distributorship contract that Defendants terminated without notice, *see, e.g.,* Ex. 1 (Transcript) at 65-66, thus leaving SSAC with no time to secure another supplier to fulfill its obligations to its drop ship customers. Again, under the holding of *Primarque,* Defendants' actions can only be regarded as intentional and improper.

There also is substantial evidence in the record, as has been argued to the Court, that Defendants' abrupt refusal to cooperate with SSAC concerning warranty issues has also significantly interfered with Plaintiffs' relationships with its customers. *See, e.g.,* Dkt. 1 ¶¶ 68-73 (factual assertions in Verified Complaint concerning warranty issues); Dkt. 8 (Assael Aff.) ¶¶ 5-8 (loss of customer relationship and reputational harm resulting from warranty response); Dkt. 34 at 9 (arguing warranty refusal as evidence of tortious interference); Ex. 2 at 29:6-30:23 (testimony concerning warranty issue), Dkt. 1 at 22, Dkt. 6 at 2 (seeking injunctive relief concerning warranty process). Specifically, after publishing and shipping an instruction manual that expressly directs customers to contact SSAC for warranty or customer services issues, *see* Ex. 1 (Transcript) at 62:23-63:13 & Dkt. 1-4,  DPI is now refusing to communicate with SSAC concerning warranties and requiring SSAC's customers to instead contact DPI directly for related services. DPI, as the party who shipped the product with a manual directing the customer to SSAC for these services, inarguably knew this relationship existed between SSAC and its customers and is intentionally inducing a breaking of the relationship by refusing to honor warranty requests placed through SSAC (and apparently by cautioning former customers that

their warranties may not be valid, Dkt. 8 (Assael Aff.) ¶ 8). SSAC has already lost customer

relationships due to this altered warranty process. *See* Dkt. 8, Ex. 2 (Transcript) at 30:5-30:24.[6]

**3. The evidence before the Court establishes that Defendant DPI likely breached its 2012 Agreement with Sonic Solutions and with SSAC as Sonic Solutions' successor.**

In its Order, the Court improperly relied upon legal analysis provided by Mr. Taylor of

SSAC under cross-examination -- which the Court described as "not convincing" -- as the

principal basis for concluding that Plaintiffs are not likely to prevail on their claim for DPI's

breach of its 2012 confidentiality and non-compete agreement that it executed with Sonic

Solutions ("2012 Agreement"). *See* Order at 9. Plaintiffs point out, however, that Mr. Taylor has

no legal training, was not prepared to provide the legal rationale as to why Defendants' use of

proprietary customer information in 2021 constituted a breach of the 2012 Agreement, and

reliance upon such testimony as evidence was improper and certainly of little relevance.

Furthermore, the Court also misstated at least one significant aspect of the testimony of

Mr. Taylor in citing to his legal analysis. That is, the Order asserts that Mr. Taylor "testified that

SSAC was not the legal successor to Sonic." Order at 9. *See also* Order at 2 (citing Taylor

testimony for proposition that "SSAC did not become Sonic's legal successor"). Aside from Mr.

Taylor's lack of qualifications to make a legal conclusion, *see* Ex. 1 (Transcript) at 47:9-11

(Judge Mastroianni: "It's a legal conclusion, a legal analysis. [Charlie Morgan]'s not qualified to

answer that question"), the transcript of Mr. Taylor's testimony indicates that he never spoke the

words "legal successor" or even "successor."  Mr. Taylor did say "No" when asked whether DPI

---

[6] The Court also failed to consider evidence that DPI's actions interfered with SSAC's expectation that it would receive a substantial investment in the company. Again, record evidence establishes that Defendants were aware of a potential investment by AlgaeSonix into SSAC, Dkt. 61 ¶ 40; that they intentionally interfered with such relationship based on the improper motive of animus, rather than business advantage, Dkt. 7 at 16, and that such action has harmed SSAC, Dkt. 9 ¶ 9 (SSAC's loss of financial viability impacts AlgaeSonix transaction).

ever stopped being a vendor for Sonic Solutions or its successor, and responded "That's correct" when asked whether DPI transitioned to supplying product from Sonic Solutions to SSAC when it was created. Ex. 1 (Transcript) at 19:11-17.

The evidentiary record in any event establishes at least a *prima facia* case that SSAC is Sonic Solutions' legal successor. To make a valid assignment under Massachusetts law, the assignor needs an intent to assign a present right, identify the subject matter assigned, and divest itself of the subject matter assigned. *See Cheswell, Inc. v. Premier Homes and Land Corp.*, 326 F.Supp.2d 201, 202 (D. Mass. 2004) (quoting *In re Gull Air, Inc.,* 90 B.R. 10, 13 (Bankr. D. Mass. 1988) and citing *Kagan v. Wattendorf & Co.,* 294 Mass. 588, 3 N.E.2d 275, 279 (1936)). Such assignment need not be written in order to be valid and enforceable. *Cheswell*, 236 F. Supp. 2d at 202.  As Mr. Taylor's testimony and the evidentiary record establish, Sonic Solutions had a present intention to assign the identified subject matter—its assets, including its contracts and its customer relationships—to SSAC, and divested itself of those assets (retaining only legacy equipment to service warranties) after their transfer to SSAC.

> Q:  What was your intention with respect to the  disposition of Sonic Solutions' contracts and other assets after SSAC began operations?
> A: After we began operations, Sonic Solutions rolled all of their customers, contracts, marketing materials, agreements, trade show space that we had reserved, et cetera, into the new company.
> Q: Were there any assets that were not rolled in? Is there anything left to Sonic Solutions, LLC?
> A: There were a few of the old product that we had left that we kept for warranty work with our customer base.

Ex. 1 (Transcript), 111:25-112:10.[7]  *See also id.* at 111:5-8 (Sonic Solutions clients rolled into SSAC).  There was, of course, further evidence that SSAC is the "legal successor" to Sonic

---

[7] Furthermore, Defendants clearly understood that SSAC was Sonic Solutions' successor. Dkt. 26-1(Trigiani Aff.), ¶ 26 ("It is my understanding that Sonicsolutions [sic] Algae Control ("SSAC")was formed in 2019, and, at that time, took over the business of Sonic Solutions"). Mr.

Solutions, including uncontroverted evidence that SSAC honored warranties issued through

Sonic Solutions without change in process, Ex. 1 (Transcript) at 53:1-7, that SSAC continues to

operate under the Sonic Solutions website with the sonicsolutions.com URL, *id.* at 53:8-12, and

that employee duties did not material change upon the creation of SSAC, *id.* at 52:5-10.

The fact that the 2012 Agreement contained a "non-assignment" clause does not alter this

analysis. Under Massachusetts law, a general non-assignment clauses bars only the delegation of

duties, not the assignment of rights. *See Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 472 (1st

Cir. 1989) (referencing, without contradicting, underlying district court order ruling that "under

Massachusetts law, a general non-assignment clause will be construed as barring only the

delegation of duties, not the assignment of rights."); *Bina v. Marks*, No. 05-5175 BLS, 2006 WL

453462, at *3 (Mass. Super. Ct. 2006) (citing Restatement in construing lease to allow

assignment of certain lease rights notwithstanding anti-assignment term within lease);

Restatement (Second) of Contracts § 322(1) (" Unless the circumstances indicate the contrary, a

contract term prohibiting assignment of "the contract" bars only the delegation to an assignee of

the performance by the assignor of a duty or condition."); *see also Rumbin v. Utica Mut. Ins.*

*Co.*, 254 Conn. 259, 267-278 (2000) (noting modern approach is that "an anti-assignment

provision . . . limits the right to assign [but] does not void an assignment"). Under these

principles, neither Sonic Solutions nor DPI could avoid its obligations under the 2012 Agreement

through its assignment, nor could they avoid those obligations by the other party's assignment to

a successor in interest. This most reasonable rule prevents precisely the situation that DPI here

asserts: that is, that it could avoid its obligations to keep Sonic Solutions' customer data

---

Trigiani, in correspondence whose authenticity is undisputed, explained to a third party that,
"Dana Taylor is the Owner of Sonic Solutions and George [Hutchinson] is the Owner of Algae
Control USA [sic], but they formed a new entity to work as one unit through which DPI sells the
algae systems." Dkt. 34-5 at 2; *see also* Ex. 1 (Transcript) at 75:8-75:12 (document authentic).

confidential simply because Sonic Solutions effectively merged into a successor company with identical interests.

The 2012 Agreement, by its express terms, is not to terminate until "the later of (a) the date that is three years after the date hereof and (b) three years after the termination of any vendor (DPI)/Buyer (Sonic) relationship." Dkt. 1-3 at 3; *see also* Ex. 1 (Transcript) at 118:17-118:25 (Taylor testimony concerning same). The plain language of a contract controls. *Artuso v. Vertex Pharms., Inc.*, 637 F.3d 1, 7 (1st Cir. 2011) (citing *Hubert v. Melrose–Wakefield Hosp. Ass'n,* 661 N.E.2d 1347, 1351 (Mass. App. Ct. 1996). Defendants do not—and cannot—dispute that they sold ultrasonic products to, and were thus a vendor to, Sonic Solutions until at least 2019 (less than three years ago), and to SSAC from its formation until April 26, 2021. Thus, Defendants use of drop ship information supplied to it by Sonic Solutions to solicit customers, including over the July 4 weekend of this year, *see* Dkts. 8-1, 8-2, 8-3, 8-4, a date less than three years after DPI terminated its "vendor (DPI)/ Buyer (Sonic) relationship," is a breach of the 2012 Agreement *even if* the assignment to SSAC was ineffective.

   **4. The evidence before the Court establishes that Defendants actions in this matter constituted unfair and deceptive acts and practices under Massachusetts law.**

The same facts that establish that Plaintiffs are likely to succeed on their tortious interference claim also demonstrate that they are likely to succeed on their claim of unfair and deceptive acts and practices by Defendants. Plaintiffs will not further review that evidence here. They do note, however, that, as a matter of law, customer information not initially marked as confidential has been recognized in this jurisdiction as a trade secret, and the use of such information, particularly after receiving a demand to cease and desist the use of such information, and related notice that the list's creator considered such information confidential,

supports a finding of tortious interference and the issuance of a preliminary injunction. *See*

*Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 239, 241 (D. Mass. 2011).

**B.  The Court Misapprehended Additional Facts That, if Corrected, Necessarily Establish a Likelihood of Irreparable Harm.**

The Order's statement that Plaintiffs do not make a strong showing of irreparable harm,

Order at 10, reflects the Court's substantive reliance upon several misperceptions of fact. First,

and apparently most importantly, the Court asserts that there was a "delay in filing suit" by

Plaintiffs of approximately a year and a half, which "delay," the Court concludes, "undermines

their argument that they will be irreparably harmed, absent immediate intervention by the

Court." Order at 10-11. This is factually incorrect.

Plaintiffs have put forth substantial, uncontroverted evidence, and have argued in their

Complaint and motions, that the threat of irreparable harm from bankruptcy and permanent theft

of its client base accrued when Defendants abruptly terminated DPI's supply of product to SSAC

and its warranty services cooperation on April 26 of this year, and, leveraging that termination,

directly solicited Plaintiffs' customers. *See* Ex. 1 (Transcript) at 119:24 125:16, Compl. ¶¶ 73,

121, 130, Dkt. 7 at 17-18, Dkt. 24 at 11. Shortly thereafter, Plaintiffs filed both their Verified

Complaint and its first motion for injunctive relief. There is absolutely no evidence that Plaintiffs

had knowledge of any basis for filing this lawsuit prior to the events beginning on or about April

26, 2021. Indeed, elsewhere in the Order the Court appears to recognize this, stating that it was

Defendants' actions on April 26, 2021 that gave rise to this action, Order at 11.

The fact that Plaintiffs, in their motion, suggested that the Court utilize the discount rates

and related terms in place between the parties on January 1, 2020 in connection with Plaintiffs'

proposed terms for the injunction Order implies nothing to the contrary. Plaintiffs suggested the

January 1, 2020 date because of the uncontested evidence that this was a date before which

Defendants actively began their surreptitious efforts to take over Plaintiffs' customers. If the Court believes a different date would be more appropriate – for example, the terms as of April 25, 2021, just prior to Defendants' termination of the deal – then it could so order.

The only other reason provided by the Court for concluding that Plaintiffs are not suffering irreparable harm is that the Court "is unconvinced by Plaintiffs' explanation as to how restoration of the January 1, 2020 status quo would resolve the alleged reputational harm that they have suffered since the spring of 2021, when Defendants contacted their customers and Plaintiffs became unable to fulfill purchase orders with drop-shipments from DPI." Order at 11. Again, this misses the point and is not an argument Plaintiffs have advanced. That is, Plaintiffs do not assert that anything the Court can do will resolve the past reputational harm that they have suffered to this point, which, indeed, is irreparable. Rather, they have pled to the Court, and continue to plea, that the Court take immediate steps *to stem further irreputable harm from continuing to accrue*. It is true that Plaintiffs have taken heroic steps to remain in business by finding product on the open market to provide to customers to maintain some semblance of their reputation. But each day that Defendants are allowed to contact and solicit Plaintiffs' customers directly, and each day that a customer then turns to Defendants for its product because of those solicitations and SSAC's inability to meet the customer's needs, Plaintiffs lose a customer whose trust will likely never be regained, representing one more spike into the heart of SSAC's business.

Plaintiffs have put forth substantial, uncontested evidence that (1) it is now losing money every month -- regardless of its ability to occasionally find product on the open market that it can provide, often at a net loss, to maintain some customer credibility – and that (2) but for creditor decisions to not put the company under, it would be bankrupt. *See, e.g.,* Ex. 1 (Transcript) at 125:10-15; Ex. 2 (Transcript) at 27:21-28:1. Bankruptcy is an

irreparable harm as the Court has recognized, *see* Order at 10, n. 2, and the uncontested evidence before the Court is that SSAC now faces that dire future without the Court's intervention, *see, e.g.,* Ex. 1 (Transcript) at 121:20-125:16. It is a situation that the Court can correct with essentially no harm to Defendants. That is, the Court can merely order Defendants to continue to make a profit by temporarily providing product to SSAC at reasonable business terms consistent with the parties' arrangements prior to April 26, 2021.

Finally, we trust that the Court recognizes that it is not in the public interest to allow a local business to go bankrupt, or that ordering DPI to temporarily continue to provide product to its distributor at reasonable business terms that had been acceptable to the parties for years is somehow against that public interest.

**C.   The Court has discretion to fashion whatever relief it finds appropriate.**

Assuming, upon reconsideration, the Court, for the reasons herein stated, finds that Plaintiffs are likely to succeed on the merits of one or more claims and will continue to suffer irreparable injury absent injunctive relief, it has considerable discretion to fashion appropriate relief, whether that be as Plaintiffs have specifically suggested, on the terms proposed by Defendant Trigiani on April 19, 2021, Dkt. 11-1, or at least as a prohibition on further contact of SSAC customers and dealers during the injunction period.

<u>**CONCLUSION**</u>

Because the Order Regarding Plaintiffs' Motions for Preliminary Injunction contained misapprehensions of found facts and failed to consider significant material, and because mistakes of law in such Order impermissibly increased Plaintiffs' burden, the Court should exercise its ongoing discretion to reconsider that interlocutory order, reopen the evidentiary hearing for Defendants' testimony on any remaining material issue, and grant Plaintiffs appropriate injunctive relief.

RESPECTFULLY SUBMITTED

PLAINTIFFS,
SONICSOLUTIONS ALGAE CONTROL, LLC,
SONIC SOLUTIONS, LLC and
ALGAECONTROL.US LLC

By Their Attorneys,

Dated: October 7, 2021

 */s/ James C. Duda*
James C. Duda, Esq. (BBO # 551207)
Lauren C. Ostberg, Esq. (BBO # 696883)
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115-5507
Tel. (413) 272-6286
jduda@bulkley.com
lostberg@bulkley.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants on the date of its filing.

/s/  *Lauren C. Ostberg*
Lauren C. Ostberg