**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **SONICSOLUTIONS ALGAE CONTROL, LLC,** | * | |
| **SONIC SOLUTIONS, LLC, and** | * | |
| **ALGAECONTROL.US LLC,** | * | |
| | * | |
| **Plaintiffs/Counter-Defendants** | * | |
| | * | |
| **VS.** | * | **Civil Action No.** |
| | * | **3:21-cv-30068-KAR** |
| | * | |
| **DIVERSIFIED POWER INTERNATIONAL, LLC,** | * | **JURY DEMANDED** |
| **and ANTONIO TRIGIANI,** | * | |
| | * | |
| **Defendants/Counter-Plaintiff** | * | |

# RESPONSE IN OPPOSITION TO MOTION FOR RECONSIDERATION OF ORDER REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendants, Diversified Power International, LLC ("DPI") and Antonio Trigiani ("Trigiani") (DPI and Trigiani sometimes collectively hereinafter the "Defendants"), submit the following response in opposition to Plaintiffs' motion for reconsideration of order regarding Plaintiffs' motion for preliminary injunction [Doc. 73].

## PROCEDURAL BACKGROUND

This action was filed by Plaintiffs on June 9, 2021 [Doc. 1].  It seeks to recover from Defendants under a number of state law legal theories, to wit: tortious interference with prospective business relationships; tortious interference with contractual relations;

intentional interference with contractual rights; violations of M.G.L.C. 93A, §11; breach of contract; breach of DPI Noncompete; injunctive relief pursuant to G.L.C. 266, § 91.  [Id].  On June 18, 2021, Plaintiffs filed a motion for temporary restraining order and/or preliminary injunction [Doc. 6].  By Electronic Order filed June 23, 2021 [Doc 19], the Court denied Plaintiffs' motion for temporary restraining order and/or preliminary injunction, to the extent it sought a ruling before Defendants may be heard, and reserved ruling on Plaintiffs' motion for a preliminary injunction.  On July 7, 2021, Plaintiffs filed a renewed motion for temporary restraining order (to be issued without further notice to defendants) [Doc. 33].  By Electronic Order filed July 27, 2021, the court denied Plaintiffs' second motion for a temporary restraining order, finding that pursuant to Fed. R. Civ. P. 65(a), it should be more properly considered as a second motion for preliminary injunction. [Doc.45].

By Electronic Order filed August 18, 2021, the Court scheduled Plaintiffs' two motions for temporary injunction for hearing.  [Doc 37].  The Order states in part that "[a]t a minimum, the court requests testimony from Defendant Trigiani and Charles Morgan, but the parties may present other evidence as they see fit."  [Id]. (emphasis added).  The Court went on to set forth certain issues on which it wanted to hear evidence.  The Court conducted a remote evidentiary hearing on August 31, 2021 and September 1, 2021 on the issues presented by Plaintiffs' two motions.  The Plaintiffs were not limited on the evidence that they were permitted to present in support of their two motions.  After presentation of evidence by Plaintiffs, the Court took the two motions for preliminary injunction under advisement.

On September 9, 2021, the Court entered Order Regarding Plaintiffs' Motions For Preliminary Injunction and denied both motions [Doc. 64] (the "Order").  Plaintiffs filed their motion for reconsideration on October 7, 2021. [Doc. 73].  For the reasons set forth in the Order and for the reasons set forth herein, Plaintiffs' motion for reconsideration should be denied.

<u>ARGUMENT</u>

1.       **Plaintiffs' motion fails to meet the requirements for reconsideration.**

      a.       **Legal Standard for motions for reconsideration.**

The Federal Rules of Civil Procedure do not explicitly discuss motions for reconsideration.  <u>Sullivan v. Dumont</u>, 391 F. Supp. 3d 161, 164 (D. Mass. 2019).  The granting of a motion for reconsideration is "an extraordinary remedy which should be used sparingly."  <u>CardioFocus, Inc. v. Cardiogenesis Corp</u>, 859 F. Supp. 2d 192, 202 (D. Mas 2012).  The Supreme Court has cautioned that lower courts should be loath to reconsider orders in the absence of extraordinary circumstances.  <u>Lyons v. Federal Mortgage Association</u>, 2019 WL 1961072, at *2-3 (D. Mass. May 1, 2019) (citing <u>Christensen v. Cott Industries Operating Corp</u>., 486 U.S. 800, 817 (1988); <u>Arizona v. California</u>, 460 U.S. 605, 618 N.8 (1983)).  A motion for reconsideration is appropriate only if "the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust."  <u>United States v. Allen</u>, 573 F.3d 42, 53 (1st Cir. 2009); See

also <u>Palmer v. Champion Mortgage</u>, 465 F.3d 24, 30 (1st Cir. 2006).  A party cannot use a motion for reconsideration to "undo its own procedural failures" or to "advance arguments that could and should have been presented earlier".  <u>Allen</u>, 573 F.3d at 53.  A motion for reconsideration is not "a mechanism to regurgitate old arguments previously considered and rejected." <u>Biltcliffe v. CitiMortgage, Inc</u>. 777 F.3d 925, 930 (1st Cir. 2014).

**b.   Plaintiffs' motion for reconsideration fails to identify any newly discovered evidence that could support reconsideration of the Order.**

Plaintiffs do not claim in their motion or supporting brief that they have discovered new evidence.  Plaintiffs make some reference in their brief that the Court should require Defendants to put forth Trigiani so they can cross examine him.  [Doc. 74, p. 3].  They also state: "Mr. Trigiani, whom. . . Defendants were expected to put forward for examination, but did not." [<u>Id</u>., p. 4].  Trigiani was present at the video conferencing during both days of testimony.  Plaintiffs could have easily called him as their witness, but elected not to do so.  Apparently, Plaintiffs made the strategic decision not to call Trigiani as a witness.  Plaintiffs present no explanation as to why they failed to call Trigiani as a witness at the evidentiary hearing or how his testimony might support their two motions or more importantly, why Trigiani's testimony supports reconsideration of the Order.  See <u>Karak v. Bursaw Oil Corp</u>., 288 F.3d 15, 19-20 (1st Cir. 2002) (A party who seeks relief from a judgment based on newly discovered evidence must, at the very least, offer a convincing explanation as to why he could not have proffered the crucial evidence at an earlier stage of the proceedings).  A motion for reconsideration cannot be used by a party to undo its own procedural failures.  <u>Allen</u>, 573 F.3d at 53.  Thus, to the extent Plaintiffs argue that

Trigiani's testimony represents newly discovered evidence, such argument should fail. Further, Trigiani has filed two detailed Declarations in this case [see Doc. 26-1, 47-1][1] thus, his testimony if presented at the hearing, was well known and not newly discovered. Plaintiffs, therefore, have failed to demonstrate the discovery of new evidence not previously available in support of their motion for reconsideration.

### c.   Plaintiffs' motion for reconsideration fails to identify any intervening change in the law from the date of the Order to support its reconsideration.

Plaintiffs do not contend that there has been an intervening change in the law that would require the Court to reconsider its Order.   Further, Plaintiffs have presented no change in the applicable law to support a reconsideration of the Order.

### d.   The Court committed no manifest error of law in denying Plaintiffs' motions for preliminary injunction.

Plaintiffs do not state that the Order was based on a manifest error of law. See Allen, 573 F.3d at 53.  Instead, Plaintiffs claim that the Order "was based upon material legal errors and misapprehension of facts" [Doc. 74, p. 3], and "the Court also relied in substantial part upon misapprehended testimony and other documents before the Court." [Doc. 74, p. 4].  Plaintiffs also contend that "[t]he Court failed to consider evidence and arguments that were before it" [Doc. 74, p. 5]; "[t]he Court misconstrued testimony and arguments that were before it", [Id]; and "[t]he Court made errors of law

---

[1]  Plaintiffs point to nothing in either of Trigiani's Declarations that support Plaintiffs' claims for injunctive relief or might support reconsideration of the denial of such relief.

concerning the doctrine of implied-in-fact contract, the effect of non-assignment clauses under Massachusetts law, and the nature of irreparable harm." [Id].  With respect to Plaintiffs factual arguments, Defendants contend that a motion for reconsideration is not a mechanism for the Plaintiffs to reargue the facts that they previously presented. Biltcliffe, 772 F.3d at 936.  In addition, motions for reconsideration are not appropriate when the Court has made a claimed error of reasoning.  Ruiz Rivera v. Pfizer Pharm, LLC, 521 F.3d 76, 81-82 (1st Cir. 2018).  Plaintiffs' efforts to obtain reconsideration of the Order based on a reargument of the facts or based on their challenges to the Court's reasoning should fail.

With respect to the claimed errors of law, Plaintiffs make the same arguments previously made to the Court in support of their motions for preliminary injunction.  This argument likewise makes reconsideration inappropriate.  See Audette v. Carrillo, 2017 WL 1025668, at *5 (D. Mass. March 16, 2017) (a motion for reconsideration does not present defendants [Plaintiffs] with an opportunity to rework and better articulate previously – failed arguments) (citing De-Giovanni v. Jani-King Int'l, Inc., 968 F. Supp. 2d 447, 450 (D. Mass. 2013)).  Alternatively, the legal arguments advanced by Plaintiffs in their motion for reconsideration, even if reconsidered, for the reasons set forth below fail on their merits.

i.     **The Court correctly applied applicable law with respect to Plaintiffs' claim of breach of an alleged implied in fact contract between Sonic Solutions Algae Control, LLC ("SSAC[2]) and DPI.**

At the preliminary injunction stage, the burden of persuasion is on the Plaintiffs to make a clear showing of the likelihood that they will prevail on the merits of their breach of implied in fact contract claim. [See Doc. 64, p. 4] (citations omitted).  In ruling on this issue, the Court found as follows:

> Massachusetts law recognizes the existence of an implied contract, in the absence of a written or express contract, based on the parties' conduct and relations. See Primarque Prods. Co., Inc. v. Williams West & Witts Prods. Co., 988 F.3d 26, 34-35 (1st Cir. 2021). . . Plaintiffs offered testimony from Mr. Taylor and Ms. Assael that the basis for Plaintiffs' implied contract with DPI was Defendant Trigiani's assurances that Diversified Power would sell its HBS products to SSAC at an unspecified reduced price and would not compete with SSAC. . . (. . . Further, Ms. Assael testified that there existed no written document in which DPI agreed that SSAC was the exclusive distributor of HBS products.) Mr. Taylor testified that SSAC usually executed written contracts when conducting other business. . . Most tellingly, Mr. Taylor did not give a persuasive reason why SSAC would not have memorialized the terms of their implied distributorship contract with DPI when SSAC's sole business was to market and sell DPI's HBS products. . . A 'reasonable notice of termination requirement may be imputed as a term into a contract for the distribution of goods,' but Plaintiffs must first show that they are likely to succeed in proving an implied-in-fact contract before they may show they are likely to succeed in proving breach of an imputed notice clause. Primarque, 988 F.3d at 34. Plaintiffs may ultimately be able to convince a jury that an implied-in-fact contract existed, but their evidence is far short of that required to show a likelihood of doing so.

[Doc 64, p. 7-8].

---

[2] SSAC is the only party plaintiff that moved for a preliminary injunction.  See Doc. 6, 33.

This record reflects that the Court's above findings were consistent with the testimony of Ms. Assael and Mr. Taylor at the evidentiary hearing. [See Doc. 74-1, p. 81-83, 87; Doc 74-2, p. 129, 130, 136]. In addition, Ms. Assael testified that neither Plaintiff SonicSolutions, LLC ("Sonic Solutions") or SSAC ever committed to a specific dollar amount of HBS products that either company would purchase from DPI. [See Doc. 74-1, p. 98]. Mr. Taylor also testified that the parties never agreed to a fixed price for Sonic Solutions or SSAC's purchase of DPI's HBS products. [See Doc. 74-1, p. 135]. Under Massachusetts law, the elements of a binding contract, whether express or implied, are terms that are sufficiently complete and definite and the present intent of the parties at the time of formation to be bound by those terms. Von Papen v. Rubman, 18 F. Supp.3d 77, 80 (D. Mass. 2014). In this case, the evidence reflects no meeting of the minds on price, an essential element of any contract for the sale of goods. See Kilroy v. Schimmel, 243 Mass. 262, 267 (1922); See also Mass. G.L.C. 106, § 2-201 (the formal requirements for a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or its authorized agent or broker). Plaintiffs presented no contract signed by DPI that satisfies Massachusetts' statute of frauds. In the absence of an agreement on price, there was no enforceable contract between SSAC and DPI for SSAC's purchase of DPI's HBS products either based on the indefiniteness of the alleged contract or the statute of frauds. Thus, the Court's decision that Plaintiffs failed to meet their burden of persuasion that there was a likelihood that they would prevail on the merits

of their breach of implied contract claim was consistent with, not contrary to, Massachusetts contract law. Certainly, Plaintiffs have not demonstrated that the Court's reasoning on this issue constituted a manifest error of law. See Ofori v. Ruby Tuesday, Inc., 205 App'x 851, 852-53 (1st Cir 2006) (A disagreement with the Court's decision is not a basis for reconsideration).

Plaintiffs rely heavily on Primarque Prods. Co., Inc. v. Williams West & Witts Prods. Co., 988 F.3d 26, 34-35 (1st Cir. 2021) ("Primarque") with respect to their argument that they are likely to prevail on their breach of implied contract claim. Plaintiffs claim that Primarque contained "virtually identical material circumstances" [Doc 74, p. 7]; in Primarque, a substantially smaller amount of course of dealing evidence was sufficient to show an implied in fact contract [Doc 74, p. 10 N.4]; and under the holding of Primarque, defendants' actions can be regarded as intentional and improper. [Doc. 74, p. 13]. Although Primarque involved a claim of breach of an implied in fact contract, it is factually distinguishable from the present case and its application here based on any factual similarities is extremely limited.

Primarque was a Massachusetts based distributor of food products, including soup based products. Primarque, 988 F.3d at 29. Williams West & Witts Products Co. d/b/a Integrative Flavors ("WWW") was an Indiana manufacturer of soup based products. Id. Primarque and WWW entered into written distribution agreements in 1987 and 1990, but by 1993 the written agreements had terminated. Id. The parties, however, continued to do a large amount of business, essentially on a purchase order by purchase order basis. Id. Some of the Primarque customers were dropped shipped

products by WWW.  Id.  Unlike this case, there was no claim of exclusivity as Primarque did sell other suppliers soup based products to its customers.  Id., at 29-30.

In May of 2014, Primarque without notifying WWW, started meeting with competitors of WWW about supplying Primarque with replacement soup based products for Primarque to sell to its customers, Id., at 30.  Thereafter, Primarque began relying on new suppliers to provide soup based products that it previously relied on WWW to supply. When WWW was informed on May 12, 2015 that Primarque was transitioning some of its business away from WWW, WWW informed Primarque that same day that WWW would no longer be selling its products to Primarque.  Id.  WWW then began selling soup based products directly to Primarque's drop ship customers.  Primarque filed suit against WWW alleging, among other things, breach of contract and tortious interference with business relations.  Id., 30-31.  Unlike this case, Primarque did not seek to enforce its implied in fact contract with WWW through a motion for preliminary injunction and sought no form of injunctive relief.  Id.

In Primarque the principal issue before this Court and the one that went to the jury was whether under Massachusetts law, WWW was required to provide Primarque with reasonable notice of its intent to terminate the parties' distribution arrangement.  Id., at 31.   This Court determined that "there is a question of fact as to whether WWW improperly terminated the parties' relationship with reasonable notice."  Id.  "[T]he District Court explained, it had allowed the breach of contract claim to go to the jury to the extent that claim was predicated on a theory that WWW had breached the reasonable notice term imputed by Mass. UCC § 2-309(3)."  Id., at 33.  The jury found that Primarque did

"have a contract for the continuing purchase and sale of soup base" and that "WWW, <u>without excuse</u>, breached its contract with Primarque by failing to provide reasonable notice for its termination of that contract." <u>Id</u>., at 31. (emphasis added).  The First Circuit affirmed the above portion of the jury verdict.

In this case, Sonic Solutions began selling algae remediation products in 2005.  [Doc. 74-2, p. 6].  The component parts of these products were manufactured for Sonic Solutions by Pyramid Technologies, a company located in Connecticut.  [<u>Id</u>].  Sonic Solutions began purchasing XSun Solar Power System[3] from DPI in 2009.  The XSun product provided an alternate power source for the end product user of Sonic Solutions' algae remediation product.  [Doc. 74-2, p. 5].  The XSun product used solar rays to charge the battery that powered the algae remediation sonic head, as opposed to electricity.  [<u>Id</u>., p. 8].  The XSun product was not a component part of the Sonic Solution algae control product, as it could be operated by simply plugging the sonic head or battery into a 110 wall outlet.  [<u>Id</u>., p. 8-9].  There was never a dealer agreement between Sonic Solutions and DPI.  [Doc. 74-1, p. 128-129].

DPI began marketing and selling its HBS products in 2014.  [Trigiani Declaration, Doc. 26-1, ¶ 24].  Sonic Solutions ceased manufacturing its algae control products in late 2017.  [Doc 74-1, p. 80, 127].  In 2018, Sonic Solutions began purchasing DPI's algae control products (HBS).  [<u>Id</u>].  There was also no written distribution agreement between Sonic Solutions and DPI for DPI's HBS product.  [<u>Id</u>., p. 80-82, 130].

---

[3]  The transcript from the August 31, 2021 and September 1, 2021 evidentiary hearing refers to these products as "Exxon" products as opposed to "XSun" products.  This is likely nothing more than a transcription error.  See Trigiani Declaration [Doc. 26-1, ¶ 11].

SSAC was formed in 2019. [Id., p. 82]. SSAC was formed as a separate legal entity from Sonic Solutions. [Id., p. 127]. SSAC began purchasing DPI's HBS products in 2019. [Doc. 26-1, ¶ 27]. There was no written dealer agreement between SSAC and DPI for SSAC's distribution of DPI's HBS products. [Doc. 74-1, p. 130]. SSAC's purchase of DPI's HBS products was on a purchase order by purchase order basis. [Doc. 74-1, p. 83-84]. There was never a fixed agreement on price and at one point in January 2020, SSAC rejected DPI's price increases, and DPI accepted SSAC's position that it would place no further orders with DPI. [Doc. 74-1, p. 134-135; Doc. 74-2, p. 16-17]. These facts support the conclusion that the parameters of the parties' contract were the terms of the individual purchase orders. On April 26, 2021, DPI notified SSAC that it would no longer make available for sale DPI algae management related products to SSAC or its affiliate company, Algaesonix, LLC. [Doc. 1-8]. Mr. Trigiani explained in his Declaration that DPI ceased doing business with SSAC because DPI had been misled by Algaesonix and SSAC which Mr. Trigiani was led to believe was one company. [Doc. 26-1, ¶ 35, 37]. DPI later learned that SSAC, through Ms. Assael, and one of DPI's former employees, Charles Morgan, had fraudulently created documents, that SSAC used for the purpose of creating the false impression that SSAC was the exclusive dealer of DPI's HBS products in order to secure a foreign contract. [Id., ¶ 41]. See also DPI's counterclaim. [Doc. 61, ¶'s 35 – 38].

As is apparent, the facts of this case differ substantially from those of Primarque. SSAC, the party seeking injunctive relief in this case, had only been purchasing HBS products from DPI since August of 2019, while Primarque and WWW had an existing business relationship for almost four decades. Primarque and WWW had

entered into written distribution agreements on two occasions.  Neither Sonic Solutions nor SSAC had a written distribution agreement with DPI for its HBS products.  In this case, SSAC claims that it had an exclusive arrangement with DPI, while in <u>Primarque</u>, there was no alleged exclusivity and Primarque did sell other suppliers' soup based products.  WWW notified Primarque that it would no longer be selling its products on the same day that WWW learned that Primarque was purchasing soup based products from other suppliers which was essentially no notice, and the jury found that WWW took such action without excuse.  Here, DPI has articulated in detail the reasons that it stopped selling its HBS products to SSAC and its affiliate, Algaesonix.  More importantly and as stated, Primarque did not seek injunctive relief nor is the proprietary of granting a preliminary injunction on an alleged breach of implied contract claim at issue in that case. These are material factual distinctions making Plaintiffs' argument that the cases have "virtually identically material circumstances" unpersuasive.

DPI contends that <u>Primarque</u> stands for the principle that whether a party breached an implied contract by failing to provide reasonable notice that is imputed into the contract is a question of fact.  See <u>Primarque</u>, 988 F.3d at 33-34.  It does not stand for the principle advanced by Plaintiffs that the facts of <u>Primarque</u> support Plaintiffs' implied contract claim in this case, nor does it support Plaintiffs' motions for a preliminary injunction or that the denial of such motions should be reconsidered.  Further, the Court correctly cited from <u>Primarque,</u> that SSAC must first prove that an implied contract existed before it can prove its breach.  [Doc. 64, p.8]; <u>Primarque</u>, 988 F.3d at 34-35. The Court correctly recognized this legal principle by stating that "[i]n fact, there may be a public interest in courts declining to issue injunctions recognizing implied-in-fact contracts when

such questions, being highly fact dependent by their nature, are best left to the jury." [Doc. 64, p. 11].  In sum, <u>Primarque</u> supports the Court's conclusion in the Order that Plaintiffs have yet to prove the existence of an implied in fact contract with DPI.  The case certainly does not support Plaintiffs' argument that the Order should be reconsidered.


ii.    **The Court should preclude or disregard Plaintiffs' argument on reconsideration regarding the enforceability of the non-assignment clause contained in the 2012 Agreement given that it was not previously raised.  Alternatively, the Court should reject such argument as it lacks merit.**


Plaintiffs, in their brief for the first time, argue that the 2012 Agreement, despite its express language to the contrary, was properly assigned by Sonic Solutions to SSAC, and that SSAC can enforce the 2012 Agreement.  [See Doc. 74, p. 14-17].  Motions for reconsideration are not to be used as a vehicle to advance arguments that could and should have been presented to the Court when it was considering Plaintiffs' motions for preliminary injunction.  <u>Allen</u>, 573 F.3d at 53.  See also <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) (The standard governing a motion for reconsideration is related to the rule of waiver, which provides that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").  For that reason alone, Plaintiffs' argument on the assignability of the 2012 Agreement should not be considered by the Court on reconsideration.  Alternatively, if considered by the Court, such argument for the reasons set forth below is without merit.

The 2012 Agreement is between Sonic Solutions and DPI.  [Doc. 1-3].  As the Court found, SSAC is not a party to the 2012 Agreement.  [Doc 64, p. 2].  The 2012

Agreement clearly states that "[t]his agreement contains the entire understanding of the parties relating to the subject matter hereof and may not be assigned." (emphasis added). The Court further found that based on Mr. Taylor's testimony, SSAC was not the legal successor to Sonic Solutions.   The Court was not persuaded that despite the non-assignment clause, Mr. Taylor could still transfer the Agreement to SSAC because he [Taylor] was responsible for it.  [Id.].  Plaintiffs' argument is essentially that the Court is to disregard such language and accept Plaintiffs' contention that not only can the 2012 Agreement be assigned, it was assigned by Sonic Solutions to SSAC.  Plaintiffs cite no authority that under Massachusetts law[4] that a trial court in interpreting a contract can simply disregard its clear language which in this case, precludes any assignment.  In fact, Massachusetts law is to the contrary, that is, courts cannot rewrite contracts for parties, but can only enforce the terms of a contract.  See Berman v. B.C. Assoc., 219 F.3d 48, 51 (1st Cir. 2000) (applying Massachusetts law) ([courts] enforce the contract as written, and are not free to revise or change it.) (citations omitted).   In addition under Massachusetts law, a contractual right can be assigned unless such assignment is expressly forbidden by the terms of the contract.  American Employers' Insurance Co. v. City of Medford, 38 Mass. App. Ct. 18, 22, 64 N.E.2d 241 (1995).  Here, the 2012 Agreement expressly forbids assignment.  Plaintiffs' argument that the 2012 Agreement can be freely assigned is directly contrary to Massachusetts law and should be rejected.

Plaintiffs also cite a number of cases for the proposition that under Massachusetts law, a general non-assignment clause will be construed as barring only

---

[4]  The 2012 Agreement also states that "[t]his agreement shall be governed in all respect by the laws of Massachusetts."  Thus, Massachusetts law governs the interpretation of the 2012 Agreement.

the delegation of duties, not the assignment of rights.  [See Doc. 74, p. 16].  The cases

cited by Plaintiffs do not support the argument that they seek to advance, nor do they

support Plaintiffs' argument that the Court can conclude at this stage that SSAC is the

legal successor to Sonic Solutions.  In Apollo Computer, Inc. v. Berg, 886 F.2d 469, 472

(1st Cir. 1989) (cited by Plaintiffs), the First Circuit did not decide the issue regarding the

non-assignment clause contained in the contract at issue, but found that the parties had

agreed to arbitrate whether a valid arbitration agreement existed between the parties.  Id.

In Bina v. Marks, 2006 WL 453462 (Sup. Ct. Mass. Jan. 5, 2006) (cited by Plaintiffs), the

issue before the court was whether a tenant could assign its right under a lease to sue

the landlord for breach of the lease for its failure to consent to an assignment of the lease

by the tenant.  Id., 2006 WL 453462, at *2-3.  The lease prohibited the tenant's

assignment of the lease without the consent of the landlord which could not be reasonably

withheld or delayed.  Id., at 1.  The court did not address the enforceability of the

assignability of the tenant's interest in the lease without the landlord's consent.  In fact,

Bina held that Massachusetts law would not permit the suit to proceed if the lease

prohibited the assignment of rights under the contract.  Id., at *3.  This case, therefore,

recognizes that Massachusetts enforces non-assignment provisions contained in written

contracts such as the one contained in the 2012 Agreement[5].  Thus, Plaintiffs' apparent

argument that the Court committed manifest error by not being persuaded by Mr. Taylor's

testimony that he could still transfer the 2012 Agreement to himself because he was

responsible for it and that SSAC can enforce such agreement, despite the undisputed

---

[5]  Plaintiffs also cite Rumbin v. Utica Mutual Insurance Company, 254 Conn. 259 (2000).  [Doc. 74, p. 16].
This case, however, was decided under Connecticut law and the 2012 Agreement is to be construed under
Massachusetts law.  Rumbin, therefore, has no precedential value in this case.

facts that SSAC is not a party to the 2012 Agreement and it expressly does not authorize its assignment, should fail.

iii.     **Plaintiffs have failed to demonstrate that the Court committed manifest error by concluding Plaintiffs failed to establish the likelihood of irreparable harm.**

The Court found that Plaintiffs' failure to show a likelihood of success was fatal to their claim for a preliminary injunction and recognized that it need not address the remaining preliminary injunction factors.  [Doc. 64, p. 10].  The Court nevertheless addressed the irreparable harm factor.  [Id].  The Court concluded (a) that Plaintiffs' delay in filing suit undermines their argument of irreparable harm absent intervention by the Court; (b) that the restoration of the January 2020 status quo would resolve the alleged reputational harm; and (c) that monetary damages was Plaintiffs' best and perhaps only form of relief.  [Doc. 64, p. 11].  The Court, therefore, concluded that Plaintiffs failed to meet its burden of persuasion of establishing irreparable harm absent the Court's intervention.

Plaintiffs' principal argument for reconsideration on the issue of irreparable harm is that [it] [SSAC] is losing money every month and absent court intervention, it would be bankrupt.  [Doc. 74, p. 19].  These arguments have already been made and rejected by the Court and are not available to Plaintiffs on reconsideration.  Biltcliffe, 772 F.3d at 930.  Further, the legal principle that preliminary injunctive relief is unavailable when the Plaintiffs have an adequate remedy at law in the form of damages is well established in the First Circuit.  See Charlesbank Equity Fund II v. Blends To Go, Inc.,

370 F. Supp. 2d 322, 330 (D. Mass. 2008).   Again, the Court's reliance on this legal principle in denying Plaintiffs' motions for preliminary injunction is consistent with applicable law, not reflective of a manifest error of law.

  **e.**  <u>**The Order was not Clearly Unjust**</u>.

   Although not specifically raised by Plaintiffs, Defendants will analyze whether the Order was "clearly unjust", as it is a ground recognized in the First Circuit for a district court's reconsideration of its interlocutory order.   This standard that Plaintiffs must satisfy is not that the Order was unjust, but that the Order was clearly unjust.   See <u>DeGiovanni</u>, 968 F. Supp. 2d at 450; See also <u>United States v. Toth</u>, 2019 WL 7039627, at *2-3 (D. Mass. Dec. 20, 2019).

   In this case, the Court permitted Plaintiffs' two motions for preliminary injunction to proceed even through the relief requested was duplicative.   It also held an evidentiary hearing and permitted Plaintiffs to present the evidence they desired to present.   The parties were permitted to fully brief the issues raised by the two motions.   The Court applied the facts presented at the hearing and the documents and declarations in this record to the applicable law.   Defendants submit such action by the Court is reflective of what justice requires, not conduct that is clearly unjust.   Plaintiffs have not identified any error of law made by the Court, newly discovered evidence or that applicable law has changed. Defendants contend that leaving the Order in place would not be "clearly unjust" as a legal or factual matter.

## CONCLUSION

Reconsideration is "an extraordinary remedy which should be used sparingly." Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006).  The situation in which courts allow reconsideration are "narrowly configured and seldom invoked."   United States v. Connell, 6 F.3d 27, 31 (1st Cir. 1993).  Plaintiffs have failed to demonstrate that this is an appropriate case for the Court to exercise such extraordinary remedy.   Accordingly, Plaintiffs' motion for reconsideration should be denied.


**HUNTER, SMITH & DAVIS, LLP**

By:     */s/Mark S. Dessauer*
Mark S. Dessauer, Esq.
TN BPR NO.: 010421
1212 North Eastman Road
Post Office Box 3740
Kingsport, Tennessee 37664-0740
dessauer@hsdlaw.com
(423) 378-8840; Fax: (423) 378-8801
Admitted Pro Hac Vice

Karen Sutherland, Esq.
Mass. Bar No. 684923
THE SUTHERLAND LAW FIRM, LLC
123 Main Street, Suite B
Belfast, Maine 04915
(207) 218-1524/ (207) 218-1624
ksutherland@thesutherlandlawfirm.com

***Attorneys for Defendants/Counter-Plaintiffs***

19

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 21, 2021 the foregoing **Response In Opposition To Motion For Reconsideration Of Order Regarding Plaintiffs' Motion For Preliminary Injunction** filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties have been served by hand delivery, overnight delivery, facsimile transmission, or by mailing a copy of same by United States Mail, postage prepaid.

Bulkley, Richardson and Gelinas, LLP
James C. Duda, Esq.
Lauren C. Ostberg, Esq.
jduda@bulkley.com
lostberg@bulkley.com


**HUNTER, SMITH & DAVIS, LLP**

_____/s/Mark S. Dessauer
Mark S. Dessauer