UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SONICSOLUTIONS ALGAE CONTROL, LLC,

       Plaintiff,

       v.

DIVERSIFIED POWER INTERNATIONAL, LLC, et al.,

       Defendants.

Civil Action No. 21-30068-MGM

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW,
MOTION FOR REMITTITUR,
AND MOTION FOR A NEW TRIAL
(Dkt. No. 339)

July 29, 2025

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Following an eight-day trial, a jury returned a verdict in favor of SonicSolutions Algae Control, LLC ("Plaintiff") in the amount of $3,393,750.00. Defendants Diversified Power International, LLC ("DPI"), Antonio Trigiani ("Trigiani"), and Hydro Bioscience, LLC ("HBS") have now filed a renewed motion for judgment as a matter of law, or in the alternative for remittitur of the jury's damages award, or in the further alternative for a new trial. Plaintiff opposes these motions, arguing the jury's verdict should stand in its entirety.

For the following reasons, Defendants' motion for judgment as a matter of law is denied. Defendants' motion for a new trial, asserting as a basis any grounds other than remittitur, is also denied. Defendants' request for remittitur is, however, granted as to the jury's award of $3,000,000 in

defamation damages and $93,750.00 in contract damages. Accordingly, unless Plaintiff accepts a reduction of that award to $1.00 in defamation damages and $53,276.00 in contract damages,[1] a new trial on these damages must be held.[2]

## II. BACKGROUND[3]

This case proceeded to trial on Plaintiff's claims for breach of an implied in fact contract, defamation, tortious interference with contract, and tortious interference with advantageous business relations. The jury heard testimony from nine witnesses and was presented with dozens of exhibits. (Dkt. No. 312.)

At the close of Plaintiff's evidence, Defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). (Dkt. Nos. 331 & 332.) Defendants raised several arguments, including: (1) HBS could not be held liable as an alter ego of DPI under Tennessee law and there was no evidence to support HBS's direct liability (Dkt. No. 331 at 3; Dkt. No. 332 at 3-4); (2) Plaintiff failed to establish the damages element of its implied in fact contract claim (Dkt. No. 331 at 6); (3) Plaintiff failed to prove its tortious interference with contract claims (Dkt. No. 332 at 4-6); (4) Plaintiff failed to prove its tortious interference with advantageous business relations claim (*Id.* at 6-9); (5) the

---

[1] The jury awarded a total of $3,393,750.00 in damages. After remittitur, the new total will be $353,277.00 in damages.

[2] In the event Plaintiff elects to hold a new trial, any proffered expert can be subject to a *Daubert* analysis, if raised, before any testimony is presented to the jury.

[3] The court recites only the background necessary to resolve this motion. The factual and procedural history of this action has been exhaustively covered in three prior decisions of this court. *See, e.g., SonicSolutions Algae Control, LLC v. Diversified Power Int'l, LLC,* 722 F. Supp. 3d 16 (D. Mass. 2024) (deciding cross motions for summary judgment); *Sonicsolutions Algae Control, LLC v. Diversified Power Int'l, LLC,* No. CV 21-30068-MGM, 2021 WL 9096701 (D. Mass. Sept. 9, 2021) (denying Plaintiff's motion for a preliminary injunction); *SonicSolutions Algae Control, LLC v. Diversified Power Int'l, LLC,* No. CV 21-30068-MGM, 2021 WL 9096699 (D. Mass. July 27, 2021) (denying motion to dismiss).

statement forming the basis for Plaintiff's defamation claim was either a nonactionable opinion, or as a matter of law true (*Id.* at 9-12); and (6) Plaintiff had not produced any evidence of actual damages tied to the defamation claim. (*Id.* at 12-14.) The court subsequently granted Defendants' Rule 50(a) motion in part, finding Plaintiff had introduced no evidence sufficient to hold HBS directly liable. (*Id.* at 15.) In all other respects, however, the court reserved ruling and sent the case to the jury. (*Id.* at 15-16.)

Following several days of deliberations, the jury returned a verdict using the detailed verdict slip approved by the parties. (Dkt. No. 314.) The jury found DPI liable for breach of an implied in fact contract, awarding $93,750.00 as damages, all of which the jury categorized as lost profits. On the defamation count, the jury also ruled in favor of Plaintiff, holding DPI and Trigiani liable for the creation and communication of the April 26, 2021 sales notice. The jury awarded $3,000,000.00 in defamation damages, all again categorized as lost profits. On the counts of tortious interference with contract and tortious interference with advantageous business advantage, the jury found DPI liable, awarding $300,000.00 in damages, also all characterized as lost profits. The jury did not, however, find Trigiani liable for tortious interference with either contract or advantageous business relations. But the jury did find that Trigiani should be held personally liable for the tortious conduct of DPI under a veil piercing theory, and further concluded DPI and HBS were alter egos for purposes of assessing liability.

Defendants timely filed their motion under Federal Rules of Civil Procedure 50(b), 59(a)(1), and 59(e).

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 50 "allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result."

*Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (internal quotation marks omitted); *see also* Wright & Miller, 9B Fed. Prac. & Proc. Civ. § 2521 (3d ed.). "[A] motion under Rule 50(b) is a renewed version of a party's motion brought under Rule 50(a)." *Santos-Arrieta v. Hosp. Del Maestro*, 14 F.4th 1, 8 (1st Cir. 2021) (internal quotation marks omitted). Thus, "[a] proper Rule 50(a) motion is a prerequisite to a proper Rule 50(b) motion." *Id.* This requirement also means a party moving under Rule 50(b) cannot "introduce a legal theory not *distinctly* articulated in the Rule 50(a) motion." *RFF Fam. P'ship, LP v. Ross*, 814 F.3d 520, 537 (1st Cir. 2016) (internal quotation marks omitted and emphasis in the original).

Generally, the party seeking to overturn a jury verdict using Rule 50 "faces an uphill battle." *T G Plastics Trading Co. v. Toray Plastics (Am.), Inc.*, 775 F.3d 31, 38 (1st Cir. 2014) (internal quotation marks omitted). The court "may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." *Id.* (quoting *Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R.*, 554 F.3d 164, 170 (1st Cir.2009)). In other words, "a verdict should be set aside only if the jury failed to reach the *only* result permitted by the evidence." *Lestage v. Coloplast Corp.*, 982 F.3d 37, 46 (1st Cir. 2020) (emphasis in original). And, in conducting this review, the evidence presented at trial must be viewed "in the light most flattering to the verdict and [the court] must draw all reasonable inferences therefrom in favor of the verdict." *Blanks v. Springfield Pub. Sch.*, 675 F. Supp. 3d 161, 167-68 (D. Mass. 2023) (quoting *Rodríguez-Valentín v. Doctors' Ctr. Hosp. (Manati), Inc.*, 27 F.4th 14, 20 (1st Cir. 2022)) (alteration added).

Similarly, "[w]hen evaluating a motion for a new trial on damages, or for remittitur, the court considers the evidence in the light most favorable to the prevailing party." *Rodriguez-Valentin*, 27 F.4th at 22. "The jury's damage award must endure unless it is 'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'" *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 13 (1st Cir. 2009) (quoting *Correa v. Hosp. San Francisco*, 69

F.3d 1184, 1197 (1st Cir.1995)). By contrast, when evaluating a motion for a new trial based on the weight of the evidence under Rule 59(a)(1), this court has "broad legal authority when considering [this type of] motion for a new trial" to order a new trial in the interests of justice. *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009) (alteration added). Despite this broad authority, the court does not sit as a "thirteenth juror[], empowered to reject any verdict with which they disagree," but the court may "independently weigh the evidence." *Id.* (alteration added and internal quotation marks omitted); *see also Breeden v. VK Krupa Corp.,* 752 F. Supp. 3d 274, 278 (D. Mass. 2024).

## IV.    DISCUSSION

### A.    Rule 50(b)

#### 1.    *Sufficiency of the Tortious Interference Evidence*

DPI raises three arguments assailing the sufficiency of the evidence presented by Plaintiff in support of the tortious interference claims. When viewed in a light most favorable to the verdict, the court is not persuaded any of these arguments justifies overturning the jury's verdict on these counts.

DPI first argues Plaintiff failed to demonstrate it was aware of its third-party dealer contracts. However, there were exhibits introduced wherein DPI indicated an awareness of Plaintiff's third-party agreements. (P-35, P-36, P-44, P-57.) There was further documentary evidence indicating DPI actively intended to solicit these dealers to buy directly from DPI, an action which DPI would presumably only have taken if it were aware these entities were buying product from Plaintiff. (P-57, P-69, P-89, P-101.) Lastly, Trigiani testified he knew Plaintiff operated through sub dealers; he knew Plaintiff had established contracts with customers; and he had seen versions of Plaintiff's actual dealer agreements. This evidence was sufficient for the jury to find DPI had knowledge of Plaintiff's third-party agreements.

DPI next contends the letter of intent between AlgaeSonix and Plaintiff was not a binding

contract and, therefore, cannot support a tortious interference with contract claim.[4] Even accepting this as true, the jury was free to view the letter of intent as supporting the tortious interference with advantageous business relations claim. There is no indication the jury relied solely (or even in part) on this document to find DPI liable under the tortious interference with contract theory.

In a final bid to override the verdict as to the tortious interference counts, DPI says Plaintiff failed to demonstrate the existence of any advantageous business relationships with which DPI interfered. However, the jury could have reasonably found Plaintiff's proposed sale to AlgaeSonix was an advantageous business relationship that did not come to fruition because of DPI's interference. DPI further asserts the proposed sale was advantageous to Dana Taylor and George Hutchinson (Plaintiff's owners) individually, but not to Plaintiff as an entity. The court does not find this persuasive, however, as the evidence demonstrated SSAC was the "seller" for purposes of the letter of intent negotiated with AlgaeSonix. (P-48; *see also* Dkt. No. 345 at 41-42, 45-46.) The jury was also free to conclude DPI's no notice termination of the implied distributorship agreement interfered with Plaintiff's relationship with its customers, as there was substantial testimony and documentary evidence presented to this effect. (P-34, P-57, P-65, P-70, P-89, P-100; D-210, D-218; Dkt. No. 345 at 28-31, 38-39.)

Accordingly, the court declines to disturb the jury's findings of liability as to the tortious interference counts.

### 2.   *Sufficiency of the Defamation Claim*

Regarding the April 26, 2021 sales notice forming the basis for the defamation claim,

---

[4] The verdict form presented the tortious interference theories to the jury as separate counts for purposes of liability. For purposes of damages, however, the form did not distinguish between the theories. The parties did not object to this delineation.

Defendants argue it was a nonactionable opinion. (D-17.) Alternatively, even if actionable, Defendants posit the notice was substantially true. These arguments are not persuasive.

Under Massachusetts law, "an expression of pure opinion is not actionable." *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015) (quoting *HipSaver, Inc. v. Kiel*, 984 N.E.2d 755, 765 n. 11 (Mass. 2013)). When deciding whether a statement is one of fact or opinion, the court looks to the totality of the circumstances, "examin[ing] the statement in its totality and in the context in which it was uttered or published . . . consider[ing] all the words used . . . [and] giv[ing] weight to cautionary terms used by the person publishing the statement." *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir. 2003) (quoting *Lyons v. Globe Newspaper Co.*, 612 N.E.2d 1158, 1162 (Mass. 1993)) (alterations added). "Merely couching a statement as an opinion, however, will not automatically shield the speaker from liability where the statement implies the existence of underlying defamatory facts." *Piccone*, 785 F.3d at 771. Ultimately, "the relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact." *Id.* at 771-72 (internal quotation marks and citation omitted).

Applying these principles to the sales notice, the court concludes it is not a statement of opinion. While the notice prefaces its first mention of misrepresentations in the marketplace with the word "may," it then goes on to unequivocally state: "DPI does not currently, nor has it ever had an exclusivity agreement of any form, or sales or distribution agreement with any party or vendor, outside of Norway, Iceland, Scotland and the Faeroe Islands." (D-17.) The notice then further requests anyone provided with "contrary information" reach out and contact DPI. (D-17.) Read together, this statement is reasonably understood as asserting the provable or disprovable fact that DPI has never entered into exclusivity agreements or sales and distribution agreements with any party or vendor in the United States. It is further understood as implying Plaintiff lied to buyers in the market about the existence of such agreements. (*See, e.g.,* P-62, P-76.)  This accusation of deceitful sales practices is

defamatory, as it would "prejudice the plaintiff's profession or business." *Ravnikar v. Bogojavlensky*, 782 N.E.2d 508, 511 (Mass. 2003); *see also Lionbridge Techs., LLC v. Valley Forge Ins. Co.*, 53 F.4th 711, 720 (1st Cir. 2022) ("[T]ort law specifically recognizes reputational harm to a business as actionable defamation."); *N. Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC*, 491 F. Supp. 2d 111, 127-28 (D. Mass. 2007); Restatement (Second) of Torts § 561(a) (1977). The court finds the sales notice was actionable under Massachusetts law.

As for the truth of the statement, it was within the jury's prerogative to find the statement false. The jury specifically concluded DPI and Plaintiff did have a distributorship agreement. It necessarily follows from this conclusion that DPI's claims regarding never entering such agreements were false. Based on these related findings and the evidence presented at trial, the court cannot say "the jury failed to reach the *only* result permitted by the evidence." *Lestage v. Coloplast Corp.*, 982 F.3d 37, 46 (1st Cir. 2020) (emphasis in original). Accordingly, the court declines to overturn the jury's liability verdict as to the defamation claim.

### 3. Lost Profits

Relying on the verdict form approved of by the parties, the jury categorized the entirety of its damages award as lost profits. Defendants now challenge the sufficiency of the evidence supporting the award of lost profits as to the implied contract and tortious interference counts. Damages, as they correctly note, are an essential element of each claim and consequently a complete failure to satisfy the damages requirement could lead to judgment as a matter of law in favor of the moving party. However, for the following reasons, the court finds sufficient evidence was introduced for the jury to calculate lost profits with respect to each count, and sufficient evidence was therefore introduced to

support the damages elements of these claims.[5]

### a. *Lost Profits Associated with Breach of Contract*

Under Massachusetts's articulation of the Uniform Commercial Code, a plaintiff may recover "[c]onsequential damages resulting from the seller's breach[.]" Mass. Gen. Law ch. 106, § 2-715(2) (alterations added). These consequential damages include, "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Mass. Gen. Law ch. 106, § 2-715(2)(a). Lost profits are available as a form of consequential damages if it is shown "that the actionable breach caused the loss and that the loss was foreseeable and calculable with reasonable certainty." *Softub, Inc. v. Mundial, Inc.*, 53 F. Supp. 3d 235, 259 (D. Mass. 2014) (quoting *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.,* 72 F.3d 190, 204 (1st Cir.1995)). While expert testimony is the most common method of presenting lost profits evidence, such testimony is not a prerequisite for recovering this form of damages, as Massachusetts law also allows a jury to consider evidence of established earnings, monthly sales, expenses, or profit margins. *See, e.g., K & K Dev., Inc. v. Andrews,* 219 N.E.3d 306, 319 (Mass. App. Ct. 2023); *Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 864 N.E.2d 518, 541-43 (Mass. App. Ct. 2007); *Kobayashi v. Orion Ventures, Inc.,* 678 N.E.2d 180, 186 (Mass. App. Ct. 1997).

As an initial matter, the court partially agrees with Defendants that damages stemming from Plaintiff's unconsummated sale to AlgaeSonix are not recoverable as consequential damages related

---

[5] As the court will explain later, the jury was not presented with any evidence to support lost profits damages as to the defamation count. In addition, the court notes Rule 50(b) is not a tool for reweighing the evidence regarding damages or critiquing the jury's damages calculations. Rather, the court simply considers whether evidence was in the record through which the jury could have reached a damages calculation.

to the breach of an implied contract. Section 2-715(2)(a)'s plain text limits recoverable consequential damages to those which "the seller at the time of contracting had reason to know" about. *Id.* There was "a total lack of evidence" in support of the notion that DPI (or any reasonably prudent seller) had, at the time the implied contract arose, any awareness that Plaintiff may eventually pursue a sale to AlgaeSonix. *Insulet Corp. v. EOFlow Co.,* No. --F.Supp.3d--, CV 23-11780-FDS, 2025 WL 1194862, at *1 (D. Mass. Apr. 24, 2025) (internal quotation marks omitted); *see also Hendricks & Assocs., Inc. v. Daewoo Corp.,* 923 F.2d 209, 215 n. 5 (1st Cir. 1991) ("The proper inquiry is whether the loss would be within the contemplation of a reasonably prudent seller at the time the contract was made."); *Hydraform Prods. Corp. v. Am. Steel & Aluminum Corp.*, 498 A.2d 339, 345-46 (N.H. 1985) (Souter, J.) (holding "[t]his reflection [in the UCC] of *Hadley v. Baxendale,* 156 Eng. Rep. 145 (1854)['s foreseeability requirement] thus limits damages to those reasonably foreseeable at the time of the contract . . . there appears to be no basis on which [the Defendants] should have foreseen a volume in excess of 400 for the season beginning in 1978. Lost profits for sales beyond that amount therefore were not recoverable[.]" (alterations added)). The testimony of Plaintiff's expert, Dr. Craig Moore, focused almost exclusively on valuing this potential lost sale and had little relationship to calculating the appropriate measure of lost profits under the Uniform Commercial Code.

Nevertheless, Defendants have not met their stringent burden to show that "the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have [returned the verdict]."*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 13 (1st Cir. 2009) (internal quotation marks omitted and alteration in original). The jury was presented with other evidence in the form of cash flow statements (P-84; D- 235, D-236), earnings records (D-7, D-8, D-9, D-10, and D-11), and sales data (D-210, D-214), from which it could "arrive at a reasonably approximate estimate of damages[.]" *Brewster Wallcovering Co.*, 864 N.E.2d at 542. Moreover, as Defendants' own expert testified, it was possible to calculate

monetary damages on either a lost profits or cover theory with a reasonable degree of certainty. Defendants' expert then presented the jury with several potential damage calculations. Accordingly, the court declines to find there was insufficient evidence to support the damages element of Plaintiff's contract claim.

### b. Lost Profits Associated with Tortious Interference

"[I]n business tort cases, where the focus is on the wrongfulness of the defendant's conduct, the award of damages is permissible on meager evidence." *Insulet Corp. v. EOFlow Co.*, --F.Supp.3d--, CV 23-11780-FDS, 2025 WL 1194862, at *9 (D. Mass. Apr. 24, 2025) (internal quotation marks omitted and alteration added). Plaintiff does not need to prove tortious interference damages with "mathematical precision," rather "[a]ll that is required is a reasonable basis of computation and the best evidence obtainable." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 19 (1st Cir. 2009) (internal quotation marks omitted).

Here, Plaintiff introduced sufficient evidence to support the damages element of its tortious interference claim. This evidence included testimony and exhibits concerning Plaintiff's proposed sale to AlgaeSonix; a sale that would have seen a $300,000 payment to Plaintiff's officers. The jury could rationally infer this $300,000 payment was, in a practical sense, the value of the business relationship with which Defendants interfered. There was additional evidence, presented by Defendants' own expert, that the value of Plaintiff's lost sales during a sixty-day notice period was just shy of $300,000. The jury was free to apply this figure to the tortious interference claim. Finally, the cash flow statements (P-84; D-235, D-236), earnings records (D-7, D-8 D-9, D-10, and D-11), and sales data (D-210, D-214), mentioned earlier, could all provide the jury with a rational basis to calculate tortious interference damages. The court, therefore, "decline[s] to second-guess the jury's evaluation of Plaintiff's [tortious interference] losses," and declines to grant judgment as a matter of law. *Forgie-*

*Buccioni v. Hannaford Bros.*, 413 F.3d 175, 183 (1st Cir. 2005) (alterations added).

### 4.  Liability of HBS

According to Defendants, Tennessee law does not recognize "lateral piercing of sister companies through what other jurisdictions call the single-business enterprise theory of liability." (Dkt. No. 340 at 15.)[6] The single business enterprise theory, in its most common formulation, provides: "[W]hen corporations are not operated as separate entities but rather integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for debts incurred in pursuit of that business purpose." *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 450-51 (Tex. 2008) (quoting *Paramount Petroleum Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534, 536 (Tex. App. 1986)) (alteration in original); *Pertuis v. Front Roe Restaurants, Inc.*, 817 S.E.2d 273, 278-82 (S.C. 2018) (discussing the doctrine in detail); *My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d 748, 751-53 (Mass. 1968) (treating the doctrine as arising from traditional principles of veil piercing). Over time, certain jurisdictions applied this doctrine in a manner that substituted mere integration for the element of abuse typically required in a classic veil piercing action. *See* Stephen B. Presser, "The Bogalusa Explosion, 'Single Business Enterprise,' 'Alter Ego,' and Other Errors: Academics, Economics, Democracy, and Shareholder Limited Liability: Back Towards A Unitary 'Abuse' Theory

---

[6] Applying a Massachusetts statutory choice of law provision, the court previously ruled Tennessee law controls issues of alter ego, veil piercing, and successor liability. *SonicSolutions Algae Control, LLC v. Diversified Power Int'l, LLC*, 722 F. Supp. 3d 16, 37 (D. Mass. 2024). "Applying state law involves interpreting and applying the rules of substantive law enunciated by the state's highest judicial authority, or, on questions to which that tribunal has not responded, making an informed prophecy of what the court would do in the same situation." *Aubee v. Selene Fin. LP*, 56 F.4th 1, 4 (1st Cir. 2022) (internal quotation marks omitted). "In making this informed prophecy, the court's task 'is to ascertain the rule the state court would most likely follow under the circumstances,' by relying on 'guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law.'" *Doe v. City of Northampton*, 738 F. Supp. 3d 93, 108 (D. Mass. 2024) (quoting *Aubee*, 56 F.4th at 4).

of Piercing the Corporate Veil", 100 Nw. U. L. Rev. 405, 423-427 (2006)[7]; *see also SSP Partners*, 275 S.W.3d at 451-56 (rejecting this articulation of the doctrine). This practice is an exception to the general rule, as "virtually all of [the states to consider and adopt the doctrine] require evidence of some sort of injustice or abuse of the corporate form to warrant disregarding the distinct corporate entities and treating the businesses as a single enterprise." *Pertuis*, 817 S.E.2d at 280 (alteration added); *see also Allied Cap. Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1043 n. 59 (Del. Ch. 2006) (observing most enterprise theory tests operate like traditional veil piercing tests); 1 Fletcher Cyc. Corp. § 43 ("If sister entities share common shareholders, owners, or parents, 'horizontal veil piercing' might be allowed if the veils separating each entity from the parent or common owners are first pierced to find that each sister entity is the alter ego of its owners."). In the court's view, the properly applied "single business enterprise" theory—requiring a showing of abuse or injustice—is not a novel legal doctrine; rather, it is an appropriate application of traditional equitable principles to a novel factual circumstance, as "the equitable doctrine of piercing the corporate veil is not limited to the parent-subsidiary relationship." *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 29 (1st Cir. 2000) (quoting *C M Corp. v. Oberer Dev. Co.,* 631 F.2d 536, 538 (7th Cir.1980)); *see also id.* ("Courts have pierced the veil in cases involving 'sibling' corporations, and in cases involving even more intricately arranged corporate structures."); *Mortimer v. McCool*, 255 A.3d 261, 283-88 (Pa. 2021) (noting traditional veil piercing and enterprise liability theories are not incompatible when properly applied); *SSP Partners*, 275 S.W.3d at 454-55.

Turning to the specifics of Defendants' argument, they rely on *Youree v. Recovery House of E. Tennessee, LLC*, 705 S.W.3d 193 (Tenn. 2025), a decision rendered shortly before trial commenced. In

---

[7] The Tennessee Supreme Court cited extensively to Professor Presser's treatise on veil piercing in the *Youree* opinion. *See* 705 S.W.3d at 207-11 (citing Stephen B. Presser, Piercing the Corporate Veil (Westlaw 2024)).

*Youree,* the Tennessee Supreme Court "endeavor[ed] to be more precise" regarding the appropriate "treatment of the doctrine [of piercing the corporate veil]" under the States's law. 705 S.W.3d at 208 (alterations added). The *Youree* Court rejected reliance on "use of rhetorical devices and picturesque terms" in favor of consideration of the "three elements of control, wrongdoing, and causation." *Id.* at 208, 212. This decision also reiterated veil piercing is "an equitable doctrine, commonly said to be used to prevent injustice," and did not alter prior holdings establishing that "the conditions under which the corporate form will be disregarded vary according to the unique circumstances of the individual case." *Id.* at 207, 211-12 (citing *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)). Following *Youree,* Tennessee law does not allow for a theory of veil piercing absent abuse of the corporate form, as "control alone is not enough to make out a claim for piercing the corporate veil." 705 S.W.3d at 213.

Therefore, if the jury had been instructed that the corporate separateness between DPI and HBS could be disregarded solely because of the degree of integration between the two entities, this instruction would have been an erroneous application of Tennessee law. But the jury was not instructed in this manner. Rather, the court instructed the jury on each of the elements set forth in *Youree.*[8] The jury then necessarily found each element present when rendering its verdict.

Contrary to Defendants' proffered reading, the court is not persuaded *Youree* forecloses the jury's decision to disregard corporate separateness in this case. In the court's view, *Youree* affirmatively forbids a mode of analysis focused solely on whether the relationship of the entities was "parent-subsidiary" or "affiliate" in nature. Such an approach, as is urged by Defendants, elevates control over

---

[8] This section of the jury instructions was styled "alter ego liability" because "[t]here does seem to be a tendency in the Tennessee state and federal cases not to make too fine a distinction between 'alter ego' and 'piercing the corporate veil,' as seems to be true in many other jurisdictions as well." Presser, Piercing the Corporate Veil, § 2:47 n. 1.

the other two elements of the test in the manner disavowed by the *Youree* Court.[9] Further, this mechanical reliance on form over substance does not account for the specific circumstances present in the case—still a relevant consideration in the court's analysis post-*Youree*—as wrongdoing and causation are entitled to be weighed alongside the manner, method, and degree of control when determining whether to disregard corporate separation. *Youree*, 705 S.W.3d at 213. Accordingly, the court declines to find HBS immune from liability in the circumstances of this case as a matter of Tennessee law.

### B.      Remittitur

Pursuant to Fed. R. Civ. P. 59(e), Defendants ask the court to order a remittitur. *See United States v. McCarthy*, 761 F. Supp. 3d 328, 335 n. 1 (D. Mass. 2024). For the reasons articulated in connection with the Rule 50(b) motion, the court denies the request for remittitur as to the tortious interference damages award, as this award was not grossly excessive or shocking to the court's judicial conscience. However, after careful consideration, the court concludes the jury's award of $3,000,000 in defamation damages and $93,750.00 in contract damages, all categorized as lost profits, was "grossly excessive, inordinate, shocking to the conscience of the court, [and] so high that it would be a denial

---

[9] As a factual matter, Defendants' own filings provide substantial support for a finding that DPI exercised complete control over HBS. For example, HBS's statement of undisputed material facts in support of its motion for summary judgment explained, "HBS is a marketing name. It allows [DPI] to put the name on marketing documents and present a unified front. Hydro Bioscience products, Hydro Bioscience Company." (Dkt. No. 163 ¶ 15.) This same filing indicates HBS has no assets, no employees (other than DPI employees), and DPI continues to manufacture all HBS products. (*Id.* ¶¶ 18-23.) Similar testimony was elicited at trial. When viewed in a light most favorable to the verdict, the evidence was sufficient to establish DPI had complete dominion over HBS, and Trigiani in turn had complete dominion over DPI, thus satisfying the first element of the *Youree* test. There may well be cases where it is not appropriate to hold affiliated entities liable based on failure to satisfy the control element, but this is not such a case. Here, the nature of the relationships between Trigiani, DPI, and HBS, is far more akin to a classic parent-subsidiary or shareholder-corporation scenario than to a true "sibling" company scenario.

of justice to permit it to stand." *Tuli v. Brigham & Women's Hosp.,* 656 F.3d 33, 44 (1st Cir. 2011) (internal quotation marks omitted and alteration added).

### 1. Defamation Damages

Under Massachusetts law, punitive damages are not available in a defamation case. *Ravnikar v. Bogojavlensky,* 782 N.E.2d 508, 511 n. 4 (Mass. 2003); *Tosti v. Ayik,* 476 N.E.2d 928, 938 (Mass. 1985) ("Both the Legislature and this court have prohibited awards of punitive damages in libel actions, even upon proof of actual malice."). Instead, "[d]amages in a defamation case are limited to actual damages, which are compensatory for the wrong that has been done." *Draghetti v. Chmielewski,* 626 N.E.2d 862, 868 (Mass. 1994); *see also Sindi v. El-Moslimany,* 896 F.3d 1, 20 (1st Cir. 2018). In a case such as this, where the statement is defamatory *per se,* "the plaintiff may recover for wholly noneconomic losses, including 'impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.'" *Sindi,* 896 F.3d at 20 (quoting *Draghetti,* 626 N.E.2d at 868). Unlike an individual, however, a corporation cannot recover for personal humiliation or mental anguish, but rather is limited to recovering the "more abstract damage to reputation." *S. Middlesex Opportunity Council, Inc. v. Town of Framingham,* 752 F. Supp. 2d 85, 120 (D. Mass. 2010) (internal quotation marks omitted); *cf. Dynamic Image Techs., Inc. v. United States,* 221 F.3d 34, 37 n. 2 (1st Cir. 2000) (explaining corporations lack emotions and therefore cannot seek to recover for claims sounding in emotional distress).

As Plaintiff notes, calculating reputational damages is an inherently imprecise task, warranting a degree of judicial deference. *See First Act Inc. v. Brook Mays Music Co.,* 429 F. Supp. 2d 429, 437 (D. Mass. 2006). Noneconomic damages are not, however, "immune from judicial review." *Trainor v. HEI Hosp., LLC,* 699 F.3d 19, 32 (1st Cir. 2012). Rather, Massachusetts law assigns "trial and appellate judges" a "special duty of vigilance in charging juries and reviewing verdicts to see that damages are

no more than compensatory" in the defamation context, as constitutional concerns and "potential difficulties in assessing fair compensation" demand close scrutiny of awards in these cases. *Tosti*, 476 N.E.2d at 937. The SJC is therefore "not slow to pronounce a verdict excessive in defamation cases," as plaintiffs are "entitled only to fair compensation for [their] actual damages, including [their] mental suffering and harm to [their] reputation, and for any special damages [they have] suffered which have been pleaded and proved." *Id.* at 938 (alterations added).

As an initial matter, the jury was instructed on the various categories of damages (reputational vs. economic) available in a defamation action. (Jury Instructions, Dkt. No. 315 at 38-39.) Presuming, as the court must, that the jury followed these instructions, the verdict here did not categorize the defamation damages as reputational, as the verdict form, agreed to by the parties, clearly assigned all $3,000,000 as lost profits damages. *See United States v. Spencer,* 873 F.3d 1, 16 (1st Cir. 2017) (noting the "long-standing presumption that jurors follow instructions"). Lost profits are a form of special economic damages requiring proof that the defamatory statement caused economic loss. *Ravnikar*, 782 N.E.2d at 511. Plaintiff's expert did not calculate lost profits attributable to the defamatory statement, and there was no other evidence tying the defamatory content of the sales notice to the loss of $3,000,000 in profit. (Dkt. No. 322 at 60.) Plaintiff urges the court not to consider the defamation award in isolation, but to instead view it as part of the larger award of economic damages. The court declines to take this approach, as the unobjected to verdict slip asked the jury to separately delineate the measure of damages as to each count, and the jury unambiguously categorized the $3,000,000 as lost profits tied to the defamation claim.

To the extent Plaintiff claims the jury's award can be upheld as a quantification of the loss of "the value of its company, as a whole and, ultimately, the future economic benefits of the contemplated sale to AlgaeSonix," the court is not persuaded any evidence supported the figure of

$3,000,000 as an appropriate measure of such a loss. (Dkt. No. 354 at 15.)[10] Plaintiff's expert variously testified the company lost out on $18,218,094 in future sales or an approximately $11,867,300 stake in the future sale of AlgaeSonix to an unknown buyer. (Dkt. No. 322 at 36; Dkt. No. 322 at 42-46; P-84.)[11] The jury's verdict indicates it was not persuaded either of these numbers was an appropriate measure of economic loss. Plaintiff alternatively suggests Trigiani's valuation of the HBS division—$5,000,000—was evidence in support of the verdict, but the jury did not rely on this figure either. (P- 53.)[12] Therefore, whether categorized as lost profits or as the value of Plaintiff's business, there was no competent evidence to support $3,000,000 in economic damages attributable to the defamatory statement. This award is consequently shocking to the judicial conscience because of its complete lack of evidentiary support.

---

[10] Plaintiff frequently attempts to blur the line between lost profits and diminished corporate value. However, "[c]learly, lost profits and diminished corporate value are distinct concepts." *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 17 (1st Cir. 2000) (alteration added).

[11] The figure of $18,218,094 was derived from future sales projections prepared by Defendant Trigiani. (Dkt. No. 322 at 35-36.) Dr. Moore multiplied Trigiani's sales projections by a historical calculation of Plaintiff's percentage of such sales, then multiplied that figure by 18.5%. (*Id.*) Trigiani's underlying projections rested on the dubious assumption that sales would grow by 100% every year. (P-84.) Dr. Moore calculated the second figure by relying on a five-year pretax income estimate for AlgaeSonix put together by Lawrence Field or Trigiani. This estimate came to $31,646,135. (Dkt. No. 322 at 42-43, 45-46.) He then multiplied this sum by 15, as he contended, without any support, that this represented AlgaeSonix's sale value in five years. While he never stated his calculation in his testimony, this would come to $474,692,025. He then multiplied this figure by 2.5% (Plaintiff's proposed stake in AlgaeSonix) to reach the sum of approximately $11,867,300. In the court's view, Dr. Moore's second valuation had no analytical basis, as it rested on untested and overly optimistic assumptions adopted by Dr. Moore with no critical inquiry, it was akin to being simply made up. Dr. Moore did not survey the industry to review other comparable corporate sales, nor did he identify any prospective purchasers willing to pay such a figure.

[12] While there is a logical basis to find that DPI/HBS sales projections could be a useful proxy for Plaintiff's future sales, the court is not persuaded there is a logical basis to conclude DPI/HBS's business valuation is a proxy for Plaintiff's valuation. HBS (through DPI) manufacturers product and has intellectual property associated with its operations. These are tangible assets which increase DPI/HBS's value. Plaintiff, on the other hand, was never more than a middleman reselling Defendants' product.

Moreover, even if the damages are viewed in a manner contrary to the verdict slip as reputational in nature, the sum of $3,000,000 remains grossly excessive. Plaintiff did not offer concrete evidence of reputational damages, such as the cost of efforts to rehabilitate the corporation's image, or proof that other entities in the industry ceased associating with Plaintiff for reasons other than their inability to supply DPI product. Rather, the testimony established Plaintiff's business was constricted and then dissolved because it was deprived of access to product.[13] Several of Plaintiff's employees were also, for example, subsequently hired by another player in the algae market—Water IQ— primarily because of their extensive contacts in the industry, an action that would likely not have occurred had Plaintiff suffered substantial reputational harm rendering its brand a pariah in the algae market. At best, the sales notice was marginally defamatory in terms of the injury caused to Plaintiff's reputation. The court therefore finds "the award was clearly excessive and probably punitive." *Linkage Corp. v. Trs. of Bos. Univ.*, 679 N.E.2d 191, 206 (Mass. 1997).

Having concluded that the jury's defamation verdict was grossly excessive, the court must apply the "maximum recovery rule" and determine "the maximum recovery for which there is evidentiary support." *Trainor v. HEI Hosp., LLC*, 699 F.3d 19, 33 (1st Cir. 2012). In determining the appropriate recovery, the court looks both to the record and to analogous cases. *Id.* As discussed earlier, there was no evidence regarding actual economic injury attributable to the defamatory statement. Similarly, the evidence presented did not demonstrate a colorable degree of reputational harm attributable to the defamatory content of the sales notice, as opposed to harm caused by Plaintiff's loss of access to product—a harm not attributable to the defamatory character of the statement. In the absence of proven economic or reputational harm attributable to the defamatory

---

[13] Plaintiff's witnesses testified in generalities when discussing reputational harm. Dana Taylor, for example, stated, "there was disparaging language out in the marketplace," but did not testify as to specific examples of reputational blowback. (*See, e.g.,* Dkt. No. 354-2 at 10-11.) Devon Assael's testimony was similarly superficial on the topic.

content of the sales notice, Plaintiff is entitled to nominal damages of $1.00. *See Ravnikar*, 782 N.E.2d at 511 ("An undamaged plaintiff may recover nominal damages."); *Shafir v. Steele*, 727 N.E.2d 1140, 1146 (Mass. 2000) ("[I]f a plaintiff cannot prove damages but can prove libel, the plaintiff is entitled to nominal damages.").

Beyond considering the evidence at trial, the court also concludes analogous cases support both the necessity of remittitur, and the appropriateness of reducing the jury's award to nominal damages. The Massachusetts Supreme Judicial Court and other sessions of this court have reduced substantial jury verdicts by significant amounts when, as was the case here, there was little evidence tying the statement to concrete reputational harm suffered by a corporate plaintiff. *See Linkage Corp.*, 679 N.E.2d at 206 (reducing $1,060,641.01 award to $0.00); *First Act Inc. v. Brook Mays Music Co.*, 429 F. Supp. 2d 429, 437-40 (D. Mass. 2006) (reducing $5,125,000 award to $555,061); *see also Vascular Sols., Inc. v. Marine Polymer Techs., Inc.*, 590 F.3d 56, 64 (1st Cir. 2009) (ordering remittitur from $4,500,000 to $2,700,000 in product disparagement case involving lost profits damages).[14] Conversely,

---

[14] While an imperfect comparator given variances in defamation law from state to state, a survey of case law reveals other federal courts often find remittitur (or other similar methods for reducing judgments) appropriate in the context of defamation claims. *See, e.g., Eshelman v. Puma Biotechnology, Inc.*, 2 F.4th 276, 282-286 (4th Cir. 2021) (vacating $22,350,000 verdict); *MyGallons LLC v. U.S. Bancorp*, 521 F. App'x 297, 304-07 (4th Cir. 2013) (vacating $4,000,000 award); *Bennett v. Hendrix*, 426 F. App'x 864, 865-66 (11th Cir. 2011) (vacating $3,600,000 award); *Prendeville v. Singer*, 155 F. App'x 303, 304-05 (9th Cir. 2005)(affirming remittal from $850,000 to $50,000); *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 734 (7th Cir. 2004) (remitting district court's already remitted award of $3,360,000 to $1,000,000); *Holzgrafe v. Lozier*, No. 18-CV-3077, 2025 WL 1276225, at *10 (C.D. Ill. May 2, 2025) (remitting $2,000,000 award to $1,000,000); *Amor v. Conover*, No. 5:21-CV-05574-JMG, 2023 WL 5339618, at *1 (E.D. Pa. Aug. 18, 2023) (remitting $750,000 award to $50,000, and $300,000 award to $20,000); *Castillo-Perez v. Bosques-Cordero*, No. CV 10-1584 (JAF/BJM), 2011 WL 13233491, at *12-13 (D.P.R. July 15, 2011) (reducing requested $200,000 default judgment award to $15,000 per plaintiff), *report and recommendation adopted*, No. CV 10-1584 (JAF), 2011 WL 13233446 (D.P.R. Aug. 30, 2011); *Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 761 (E.D. Va. 2009) (remitting $24,000 award to $6,000); *Riccardi v. Vanderbilt Univ. Med. Ctr.*, No. CIV.A. 3:06CV0605, 2008 WL 60507, at *5 (M.D. Tenn. Jan. 2, 2008) (remitting $1,500,000 award to $250,000), *aff'd sub nom. Kessler v. Riccardi*, 363 F. App'x 350 (6th Cir. 2010); *Shaffer v. State of Ariz. Citizens Clean Election Comm'n*, No. 03CV2344PHXFJM, 2006 WL 155880, at *3 (D. Ariz. Jan. 19, 2006) (remitting $1,100,000 award to $660,000); *Blaine Larsen Processing, Inc. v. Hapco Farms, Inc.*, No. CIV.97-0212 E BLW, 2000 WL

when other courts have upheld similar sized defamation verdicts under Massachusetts law, these cases involved individual plaintiffs (not corporations), difficult to quantify damages for mental anguish or emotional harm, and far more egregious defamatory content and context.[15] In the court's view, these cases collectively support the conclusion that the jury's decision to award a $3,000,000 verdict was an erroneous attempt to punish Defendants, rather than a permissible effort to compensate Plaintiff for the harm caused by the sales notice.

Accordingly, the court finds remittitur is appropriate. However, because Plaintiff retains a Seventh Amendment right to a jury trial on the issue of damages, it may either accept $1.00 in damages or elect to have a new trial on the issue of defamation damages. *See Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 513-14 (1st Cir. 2011).

### 2. Contract Damages

Similarly, while the court found there was sufficient evidence for the jury to calculate lost profits damages for the breach of contract claim, the court finds the award of $93,750.00 in such

---

35539979, at *12-13 (D. Idaho Aug. 9, 2000) (remitting $11,200,000 award to $5,000,000). In addition, a review of the factual background of these cases reveals defamatory content and context that is far worse reputationally than the statement presented to the jury in this case.

[15] *See, e.g., Sindi v. El-Moslimany,* 896 F.3d 1, 11-12, 20-21 (1st Cir. 2018) (affirming $500,000 award to scientist targeted by a five-year campaign, including approximately 132 accusations of academic fraud, repeated on blogs, in the national media, and by word of mouth to colleagues and investors); *Van Liew v. Eliopoulos,* 84 N.E.3d 898, 913-15 (Mass. App. Ct. 2017) (upholding $2,750,000 in reputational damages caused by 26 defamatory statements republished in the media numerous times over a five-year period, leaving town selectman a pariah in the community); *Bergeron v. L & M Flooring, LLC*, 87 N.E.3d 1202, 2017 WL 3623500 (Mass. App. Ct. 2017) (table) (upholding $375,000 award based on false allegation employee committed a theft); *Murphy v. Bos. Herald, Inc.,* 865 N.E.2d 746, 751, 764-67 (Mass. 2007) (affirming $2.01 million dollar award predicated on numerous defamatory statements regarding the character of a state court judge published in Boston Herald and amplified in the national media); *Fiori v. Truck Drivers, Loc. 170*, 354 F.3d 84, 86-91 (1st Cir. 2004) (affirming remittitur of $300,000 award, arising from false accusation of purloining union funds, to $150,000). As these cases illustrate, the jury's award was exceptionally large compared to other defamation verdicts awarded in Massachusetts.

damages grossly excessive in light of the evidence presented. The only coherent evidence offered on the subject was presented by Defendants' expert. Ms. Decker's calculations were the only figures accounting for Plaintiff's duty to mitigate damages. They were also the only figures based on proposed periods of reasonable notice, as required by the Uniform Commercial Code. In contrast, Plaintiff's expert offered no discernable testimony on the subject. Unlike the more amorphous damages potentially allowed in the business tort context, contract damages should be calculated and presented to the jury with a degree of reasonable precision, as such damages "should not exceed the value of the benefit of which he was deprived." *Selmark Assocs., Inc. v. Ehrlich*, 5 N.E.3d 923, 937-38 (Mass. 2014); *see also Pierce v. Clark*, 851 N.E.2d 450, 453-54 (Mass. App. Ct. 2006) (rejecting claimed consequential damages as "purely speculative and not proven to a reasonable certainty by sufficient or substantial evidence.").

Here, the maximum figure supported by the evidence at trial was $53,276.00. This figure, calculated by Ms. Decker, relied on a ninety-day period of reasonable notice. The testimony and documents presented described a cyclical market, wherein the highest consistent sales volume tended to occur in the run up to (or during) the summer. Ninety days would have allowed Plaintiff to seek a replacement supplier in time for the 2022 algae season, while also allowing Plaintiff to meet demand for the 2021 season that was underway when the termination was announced. This temporal factor inherent to the algae remediation industry—requiring peak inventory during the spring months to ensure customer supply during the algae rich (but seasonally short) summer months—makes a reasonable notice period that is either longer or shorter than ninety days inappropriate. The court is therefore persuaded this is the longest period of reasonable notice supported by the evidence. Ms. Decker calculated Plaintiff's total lost sales during this period of reasonable notice as $347,955. She then applied a cash flow ratio of 15.3%. This ratio, unlike the risk-free 18.5% ratio suggested by Plaintiff's expert, appropriately accounts for risk. After multiplying $347,955 by 15.3%, Ms. Decker

concluded Plaintiff lost $53,276 in profits. This figure was the only sum presented to the jury grounded in both reliable methods and the UCC, rendering it the maximum recovery supported by the evidence and the law.

Accordingly, Plaintiff may either accept a reduction of the contract damages award from $93,750.00 to $53,276.00 or proceed with a new trial on the issue of contract damages.

### C.    Rule 59(a)(1)

Defendants' final alternative argument requests a new trial pursuant to Rule 59(a)(1), contending there was insufficient evidence to support the jury's verdict. The court is not persuaded a new trial is appropriate.

As Defendants correctly note, "[i]n some cases, the evidence might preclude judgment as a matter of law and yet lean so heavily in the other direction so as to justify a district judge in ordering a new trial," but the court is not persuaded this is such a case. *Sailor Inc. F/V v. City of Rockland*, 428 F.3d 348, 353 (1st Cir. 2005). The parties presented dueling testimony and introduced scores of exhibits, but ultimately this case was decided by the jury's credibility determinations regarding the existence of an implied in fact contract for the distribution of goods. Based on its own assessment of the witnesses, the court cannot say the jury erred in crediting the testimony proffered by Plaintiff over that proffered by Defendants. Similarly, the documentary evidence presented rationally supported the conclusion that these entities (and individuals) had a lengthy history of doing business together under various guises which ultimately led to the creation of an implied in fact distributorship agreement. When viewed together, this evidence persuades the court that the jury's findings regarding liability were rationally drawn and supportable. While "a contrary verdict may have been equally . . . supportable," the jury's conclusions were not so unsupported as to constitute a miscarriage of justice. *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009) (internal quotation marks omitted and alteration in

original).

Accordingly, Defendants' Rule 59(a)(1) motion is denied.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion for judgment as a matter of law is denied. Defendants' motion for remittitur is granted in part and denied in part. Specifically, it is granted as to the defamation and contract damages, but it is denied as to the tortious interference damages. Unless Plaintiff accepts a reduction of the damages award in accordance with the remittitur order, a new trial on the issue of defamation and contract damages will be held. Finally, Defendants' motion for a new trial, asserting as basis for the new trial request any grounds other than remittitur, is denied.

It is So Ordered.

_/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge